## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRED E. WEIDERHOLD, JR.,        ) | |
|        ) | |
| Petitioner,        ) | |
|        ) | |
| v.        ) | Misc. Civil No. 06-0423 (PLF/DAR) |
|        ) | |
| KNORR BRAKE CORPORATION,        ) | |
|        ) | |
| Respondent.        ) | |

## RESPONSE OF KNORR BRAKE CORPORATION
## TO THE ORDER TO SHOW CAUSE DATED OCTOBER 13, 2006

Respondent Knorr Brake Corporation ("KBC"), by and through its undersigned counsel, hereby submits its Response to the Court's Order issued October 13, 2006 ("Order to Show Cause"). The Order to Show Cause was issued in response to the Petition of the National Railroad Passenger Corporation Inspector General for Summary and Expedited Enforcement of Administrative Subpoena Duces Tecum (the "Petition") filed by Fred E. Weiderhold, Jr., Inspector General of the National Railroad Passenger Corporation ("Amtrak") on September 18, 2006.[1]

---

[1] Citations herein to the Petition will be abbreviated "Pet."; citations to Petitioner's Memorandum in support of the Petition will be abbreviated "Pet. Mem." Exhibits to the Petition will be cited as "Pet. Ex. ___," and exhibits to Petitioner's Memorandum will be cited as "Pet. Mem. Ex. ____." References to the Exhibits attached hereto in support of KBC's Response will be cited simply as "Ex. ___." Finally, citations to the "Memorandum In Support of Knorr Brake Corporation's Response to the Order to Show Cause Filed October 13, 2006," filed simultaneously herewith, will be abbreviated as "KBC Mem."

## I.    INTRODUCTION

1.    On April 14, 2005, over eighteen months ago, cracks were discovered in spokes of friction disc brakes for the passenger cars on Amtrak's Acela trains (the "Acela Brake Spoke Problem"), resulting in the temporary suspension of Amtrak's Acela high-speed train service while the cause and extent of the problem with spoke cracks was investigated. Within a few months, the Acela trains were retrofitted with redesigned disc brake rotors and restored to service.

2.    Since that time, all safety issues regarding the brake spoke cracks have been resolved, and all commercial issues related to the brakes have been resolved among Amtrak, Bombardier, Inc. ("Bombardier"), Alstom Transportation, Inc. ("Alstom"), the Northeast Corridor Maintenance Services Company ("NeCMSC"), and KBC. Although neither Amtrak nor any governmental agency appears to consider the long-since resolved Acela Brake Spoke Problem to be an ongoing matter of concern, Petitioner has seized upon the Acela Brake Spoke Problem as its singular crusade. Petitioner heaps demand upon unreasonable demand in an investigation that has now become largely an exercise in bureaucratic brinkmanship divorced from any meaningful inquiry into matters truly relevant to the Acela Brake Spoke Problem.

## II.    PROCEDURAL HISTORY

3.    On May 5, 2005, Petitioner issued an administrative subpoena duces tecum, Subpoena Number 05-03 (hereinafter, the "Subpoena"), to KBC, seeking the production of certain records and documents described in Attachment A to the Subpoena. The Subpoena carried a return date of June 5, 2005.

4.    Petitioner maintains that the Subpoena was issued in support of the Inspector General's investigation into "the discovery of cracks on disc brake rotor spokes on Amtrak's Acela trains" – *i.e.*, the Acela Brake Spoke Problem. Pet. ¶ 10. Petitioner further concedes that

the investigation underlying the Subpoena is "focused" on four issues that pertain solely to the cause, discovery, and consequences of cracked disc brake rotor spokes. Pet. ¶¶ 9, 11. In spite of the purportedly narrow "focus"[2] of Petitioner's investigation, the Subpoena contains sweeping and poorly-defined requests for documents, implicating a massive number of documents, both hard-copy and electronic, that could be potentially responsive to Petitioner's requests, including many documents that would be of no relevance to the narrow Acela Brake Spoke Problem issues Petitioner is purporting to investigate.

5.    For example, although the Inspector General's investigation was purportedly focused only on cracks in the spokes of disc brakes on Acela trains, and only one type of brake in the Acela trainsets includes spokes (passenger car friction brakes), the Subpoena broadly requests information about *all* Acela brakes. Pet. Ex. 1. Moreover, at least two requests are not limited to the brakes, but demand information about other equipment or systems on the trains – including one demand for all service and repair information related *to the entire Acela train*. *See* Pet. Ex. 1, Request No. 5 (demanding production of "[a]ll documents which describe, discuss or relate to … systems or equipment directly connected to the brakes"), and Request No. 7 (demanding production of "[a]ll Technical Service Advisories or documents providing service or repair information related to the Acela trains").

6.    Some of the requests in the Subpoena are so vague or poorly worded as to be simply unintelligible: "All documents which describe, discuss or relate to … statements pertaining to the Acela brakes." Pet. Ex. 1, Request No. 10.

---

[2] As described in greater detail below, it would be inaccurate to use the word "focus" in connection with Petitioner's investigation, as Petitioner is apparently expending the majority of its time and effort on issues unrelated to the subject matter of the investigation, such as demanding the reformatting or indexing of documents already produced, demanding certificates of compliance, demanding reports on e-mail server crashes and back-up tapes, etc.

7.     The Subpoena directs that electronic documents stored on a hard drive be copied onto a disk or tape for production. Pet. Ex. 1, Instruction No. 1. This instruction says nothing about requiring production of such documents as "native files" or as "bit stream copies." Indeed, nowhere in the Subpoena do the words "native files," "bit stream copy," "metadata," "hash code," "Master File Table," or "slack space" appear.

8.     On September 18, 2006, the Amtrak Inspector General filed the Petition herein, seeking summary and expedited enforcement of the Subpoena. The Petition alleges that KBC's document production has been deficient in that: (i) KBC has not produced all of its electronic documents; (ii) KBC has not produced its electronic documents in their so-called "native format"; (iii) KBC has not executed a certificate of compliance demanded by Petitioner; (iv) KBC has not generated the index demanded by Petitioner, identifying every document produced by KBC and identifying each document request in the Subpoena to which that document is responsive; and (v) KBC has not produced a privilege log. The Petition was not accompanied by any supporting affidavits verifying the allegations in the Petition.

9.     On October 13, 2006, the Court issued the Order to Show Cause, directing KBC to show cause in writing why it should not be compelled to obey the Subpoena in accordance with the demands in the Petition. KBC's Response follows.

## III.    FACTUAL BACKGROUND

10.     Despite the Subpoena's overreach and its poorly worded requests, KBC immediately undertook to provide documents responsive to the Subpoena and relevant to the issues under investigation by Petitioner. Recognizing that a comprehensive immediate production was impossible given the volume of documents subject to the Subpoena, KBC sought to provide Petitioner with documents according to the priority established by Petitioner's staff. Specifically, on June 2, 2005, counsel for KBC met with counsel for Petitioner to discuss the

Subpoena and how KBC could best begin to produce the documents deemed the highest priority by Petitioner. Ex. 1.

11.     At the meeting on June 2, 2005, Petitioner prioritized its requests under the Subpoena as follows: (1) the highest priority was assigned to documents relating to all contracts, subcontracts and/or agreements between KBC and any other entity related to the Amtrak Acela trains (as specified in request number 1 of the Subpoena, but limited at that time to the basic contract documents); (2) the next highest priority was assigned to documents Petitioner described as pertaining to KBC's knowledge of matters relating to any potential defects or problems with products for Amtrak Acela trains (as specified in Subpoena requests numbered 7, 8, 10 and 12); and (3) the third highest priority was assigned to all technical service manuals, bulletins, and advisories for the Acela trains related to the brakes only (as specified in Subpoena requests numbered 2, 5, and 6). Ex. 1.

12.     On June 14, 2005, less than two weeks after counsels' first meeting to discuss the Subpoena, KBC produced the contract documents Petitioner had identified as the highest priority among all of the documents sought by the Subpoena. *See* Ex. 2. These documents produced on June 14, 2005 consisted of approximately 1,300 pages. On July 13, 2005, KBC produced the technical service manuals, bulletins, and advisories for the Acela trains related to the brakes only, which Petitioner had categorized as the third-highest priority among all of the documents sought by the Subpoena. Ex. 2. These service manuals, bulletins and advisories consisted of approximately 27,600 pages. *Id.* Thus, by July 13, 2005, KBC had produced two-thirds of the categories of documents the Petitioner itself had identified as most critical to its investigation. KBC's counsel explained that KBC was proceeding with production of the documents identified

by Petitioner as its second priority, but indicated that it had not completed the review of KBC files initially gathered in response to the Subpoena. *Id.*

13.    On July 27, 2005, KBC substituted two replacement compact discs ("CDs") containing the images of the service manual documents, which had been initially produced on July 13, 2005.    The replacement CDs corrected an error by the vendor KBC had used to reproduce the documents for the July 13, 2005 production that caused the July 13, 2005 production to be difficult to read.    Ex. 3.

14.    By e-mail of August 9, 2005, counsel for KBC provided an update to Petitioner's counsel on the immense volume of electronic documents that KBC would need to gather as being potentially responsive to the Subpoena.    Ex. 4.    Counsel for KBC informed Petitioner that "[t]he estimated volume of the electronic data at Knorr is approximately 30 GB [gigabytes] for the period after August 2004, and approximately 10 GB for the period before." *Id.*    Counsel for KBC also explained that the electronic data potentially responsive to the Subpoena was dispersed among the personal computers of several employees as well as KBC's servers.    He explained that KBC had indicated it would take about two weeks to gather that electronic data from the various sources. *Id.*

15.    Because the electronic data was not readily available at that time, KBC offered to accommodate Petitioner's investigation by making its hard-copy documents available for inspection on an expedited basis.    This accommodation by KBC was in response to a request raised by Petitioner's staff in the initial June 2, 2005 meeting between counsel for KBC and Petitioner.    Ex. 5.    In order to streamline KBC's production and Petitioner's review of relevant documents, KBC made the original hard-copy documents potentially responsive to the Subpoena available for inspection by Petitioner at the offices of KBC's counsel.    Moreover, to expedite the

production of these documents, KBC produced them prior to their review by counsel for identification of sensitive commercial information or privileged information, which prior review would have delayed production substantially. *Id.* at 2.

16.    Petitioner's staff was permitted to review these original hard-copy documents as they were maintained by KBC in the ordinary course of business, and Petitioner's staff took advantage of this opportunity by reviewing at least 72 double-sized boxes of documents and selecting for production those documents it deemed relevant. *See* Exs. 5-16. Petitioner's staff spent approximately a month reviewing KBC's original hard-copy documents, and requested copies of documents totaling approximately 12,600 pages as a result of its review.    The documents selected for reproduction by Petitioner's staff were produced to Petitioner within days of their selection. *See* Exs. 7-16.

17.    While Petitioner's on-site review of KBC's original hard-copy documents was ongoing, counsel for KBC continued to engage with Petitioner regarding KBC's efforts to gather, review and produce its electronic data.   In a letter dated September 12, 2005, KBC advised Petitioner that it had gathered the universe of potentially responsive electronic documents, which totaled slightly more than 18 GB of data. Ex. 11. KBC's letter also identified the KBC employee or location from which the electronic files had been gathered and the amount of data gathered from each source in an effort to assist Petitioner in prioritizing the files it wanted produced first. *Id.* Petitioner and Respondent initially discussed handling production of KBC's electronic documents in the same manner it had produced its hard-copy documents: that is, allowing the Petitioner to inspect the electronic documents on an expedited basis and identify any of those documents it wanted to be reproduced.   Based on conversations with Petitioner's staff on September 12, 2005, however, KBC came to understand that Petitioner was

reconsidering whether to proceed with production of the electronic documents on the basis employed with the hard-copy documents. *Id.* KBC requested in its September 12, 2005 letter that Petitioner notify it promptly whenever Petitioner made a final decision to reject the hard-copy method of production, as that would require KBC to begin reviewing the electronic documents for responsiveness, privilege, and proprietary information, as well as processing the documents with Bates numbers and other protective legends prior to production. *Id.*

18.     On September 22, 2005, KBC advised Petitioner that, based on its conversations with Petitioner's staff, it understood that Petitioner had made a final decision not to proceed with production of the electronic documents on the same basis as the hard-copy documents. Ex. 14. Accordingly, KBC indicated that it would begin to review and process the electronic documents for production to Petitioner. KBC explained that the review process would be time-consuming, given the amount of material needed to be reviewed for privilege, but provided additional information about the custodians of the electronic documents in an effort to assist Petitioner in prioritizing the order of production of the electronic documents KBC had gathered in response to the Subpoena. *Id.* In response to a request from Mr. Tatum of the Inspector General's office the day before, KBC's September 22, 2005 letter confirmed that (i) after KBC's review and processing, the electronic documents produced would be provided to Petitioner on DVDs; and (ii) the attachments to e-mails would appear immediately following the e-mails to which they are attached, with the possible exception of video files, which KBC indicated might be produced on a separate DVD. *Id.* Significantly, KBC's September 22, 2005 letter did not mention "native files," "metadata," "hash codes," or "bit stream copies" of the electronic documents, as Petitioner's staff had never mentioned these terms. To the contrary, KBC would not have needed to provide details regarding how e-mail attachments would be produced if either the

Subpoena or Petitioner's staff had insisted upon production of the electronic documents in their "native format." *Id.*

19.     Petitioner responded to KBC's letter of September 22, 2005 with a letter from Mr. Tatum on September 23, 2005. Ex. 15. Mr. Tatum's letter acknowledged KBC's September 22, 2005 letter and did not object to the manner in which KBC proposed to produce the electronic documents. *Id.* Moreover, much like the Subpoena itself, Mr. Tatum's letter said nothing whatsoever regarding "native files," "metadata," "hash codes," or "bit stream copies" of the electronic documents. Despite the information provided by KBC regarding the sources of the electronic documents it had gathered, Petitioner declined to prioritize any of those sources to assist KBC in producing the electronic documents. *Id.*

20.     Once the "ground rules" for production of the electronic documents had finally been established in late September, 2005, KBC began to review and process the electronic documents it had gathered in response to the Subpoena. By e-mail dated November 9, 2005, counsel for KBC updated Mr. Tatum of Petitioner's staff regarding the status of KBC's production efforts. Ex. 17. Specifically, counsel for KBC advised Mr. Tatum that the electronic documents totaled about 550,000 pages, and that production had been delayed due to some technical issues with the Bates numbering of the electronic documents. *Id.* KBC also advised Mr. Tatum that approximately 20% of the 550,000 pages of documents needed to be reviewed for privilege prior to production. *Id.* Mr. Tatum replied to KBC's November 9, 2005 e-mail within a few minutes, thanking KBC for the update and requesting a "rolling" production of the electronic documents in installments, rather than waiting for an "en masse" production when all of the documents were ready for production. Ex. 18. Mr. Tatum's November 9, 2005 e-mail said nothing whatsoever regarding "native files," "metadata," "hash codes," or "bit stream

copies" of the electronic documents. Nor did Mr. Tatum's e-mail raise any objection to KBC's processing of the electronic documents with Bates numbers, a process fundamentally irreconcilable with production of the documents as a "bit stream copy" or in their "native" format. *Id.*

21.    KBC readily acceded to Petitioner's request for a "rolling" production of the electronic documents and, in fact, transmitted its first installment of electronic documents to Petitioner on November 15, 2006 – within a week of Petitioner's November 9, 2005 request. Ex. 19.  The cover letter accompanying KBC's November 15, 2005 production explained that the DVD KBC was producing contained (i) a Concordance database, (ii) an Opticon image table, and (iii) the Bates numbered images of each document. *Id.*

22.    The Concordance databases KBC has produced to the Amtrak OIG have contained the metadata associated with KBC's electronic documents.  Declaration of Joel Sandler, dated November 22, 2004 ("Sandler Dec."), ¶ 4.  The Concordance database is a standard method for delivering and reviewing large amounts of document metadata and searchable document text on a document-by-document basis. *Id.*  It contains information such as e-mail author, e-mail recipient, e-mail sent date, document creator, document creation date and the actual text of the document.  It also provides information that allows e-mails to be related to their attachments and vice versa. *Id.*  The information in the Concordance database is searchable in several ways:  full-text searching, Boolean searching, date-restrictive searching, wildcard (partial-word) searching, exclusive searching and field-specific searching. *Id.*  This search capability extends to searching of both the document text and the document metadata.  Sandler Dec. ¶ 10.

23.     The ability for Petitioner to search the content of KBC's electronic document productions has been greatly enhanced by the inclusion of the data in a database tool such as Concordance when compared to a production delivered in strictly native format.  While native files are generally text-searchable, the metadata is generally not searchable from the native application.  *Id.*  Additionally, without advanced searching tools like Concordance, it is impossible to create linked or Boolean searches of native file documents.  *Id.*

24.     One of the components of KBC's November 15, 2005 production (and all subsequent KBC productions of electronic documents), the image load file (referred to in KBC's letter as the "Opticon image table"), is a standard format for configuring an image viewer such as Opticon or IPRO View to view the TIFF[3] images in a document-by-document fashion.  Sandler Dec. ¶ 6.  The image load file contains information such as where the document breaks occur in the image set, and the page length of each document.  If the image viewer such as Opticon or IPRO View is configured properly, the images viewed will correspond to the document metadata being viewed in Concordance.  Thus, when the user runs a search in Concordance, the image viewer is able to display the TIFF images corresponding to the search results in a document-by-document format.  *Id.*

25.     On November 27, 2005, KBC responded to some initial questions from Mr. Tatum regarding the first production of electronic documents, totaling approximately 55,000 pages.  Ex. 20.  Counsel for KBC explained to Mr. Tatum that Petitioner could use the Concordance software – which Petitioner had indicated it possessed – to conduct searches of the documents, view images of the documents, and print images of the documents.  *Id.*  On November 28, 2005, Mr. Tatum thanked KBC for providing information about how to search

---

[3] The term "TIFF" is a common abbreviation for the "Tagged Image File Format."

and access the documents and inquired as to the production of the next set of e-mails. *Id.* Mr. Tatum's e-mail did not question the manner in which KBC had produced the electronic documents or suggest in any way that the production of the documents as a Concordance database of images was somehow less than fully compliant with the Subpoena. Nor did Mr. Tatum's November 28, 2005 e-mail make any request for "native files," "metadata," "hash codes," or "bit stream copies" of the electronic documents. *Id.*

26.    On January 12, 2006, Mr. Tatum sent a letter to counsel for KBC regarding the production of electronic documents. Ex. 21. Mr. Tatum's January 12, 2006 letter stated that Petitioner was "seeking to resolve this issue in a manner that has Knorr providing to the OIG all responsive electronic records or asserting privilege with respect to any withheld records." *Id.* As with previous correspondence from Petitioner's office, Mr. Tatum's letter said nothing whatsoever regarding "native files," "metadata," "hash codes," or "bit stream copies" of the electronic documents. Nor did Mr. Tatum's January 12, 2006 letter express any concerns that the manner in which KBC had produced its initial installment of electronic documents failed to comply with the requirements of the Subpoena in any respect. *Id.*

27.    Counsel for KBC responded to Mr. Tatum's January 12, 2006 letter by e-mail dated January 17, 2006. Ex. 22. That e-mail explained that KBC's efforts to produce another installment of electronic documents had been hampered by the illness of KBC's counsel, who had been out of the office for an extended period of time since late November. Nevertheless, counsel for KBC explained that KBC would be attempting to cull non-responsive and privileged documents from the database to allow for production of additional installments of electronic documents. *Id.* Noting that the volume of documents involved made such a process extremely

unwieldy and time-consuming, KBC asked whether Petitioner had developed or could provide a list of key search terms that KBC could use to identify responsive documents more quickly. *Id.*

28.     On January 18, 2006, Mr. Tatum replied to this request for relevant search terms, indicating in an e-mail that he would speak to Mr. Sadoff in Petitioner's office "to see if there is a list of search terms that we can provide you in an effort to expedite the process." *Id.* Several days later, on January 23, 2006, Mr. Tatum provided a series of search terms for KBC to use to winnow the volume of electronic documents.  Ex. 23.  According to Mr. Tatum, the terms provided by Petitioner "include word(s) or parts thereof, part numbers for discs, and serial numbers for cracked discs." *Id.*  The specific search terms provided by Petitioner were as follows:

> A. Search terms: condition OR risk OR defect! (to include defect, defected [*sic*], defective) OR deficien! OR malfunction! OR crack! OR fracture! OR tear! OR rip! OR resonan! OR fatigue OR strain OR vibration OR disc* OR disk* OR spoke*
>
> B. Part No. for discs: 39566/2000 OR 39566/2030 OR *42120088S* OR *42120089S* OR WS700S*
>
> C. Serial No. for cracked discs: 040305 OR 090033 OR 209902 OR 279912 OR 309913 OR 309914 OR 310008 OR 339922 OR 339939 OR 339940 OR 339958 OR 3399914 OR 499905 OR 509902 OR 509904 OR 587410 OR 587640 OR 638411 OR 693332.

29.     KBC used the search terms provided by Petitioner to query the database of electronic documents and to identify which documents contained any of the search terms.[4]  On February 3, 2006, KBC notified Mr. Tatum that application of Petitioner's search terms to the database had identified more than 29,000 documents, totaling more than 370,000 pages in the

---

[4] KBC's ability to query the database of potentially responsive electronic documents with the search terms provided by Petitioner confirms that the electronic documents are, in fact, searchable, notwithstanding Petitioner's recent claims to the contrary.

aggregate, that contained one or more of Petitioner's designated search terms. Ex. 24. Because the initial set of search terms provided by Petitioner did little to reduce the volume of electronic documents KBC would be required to review for responsiveness and privilege, KBC asked Mr. Tatum whether he had "any thoughts on how this [volume of documents] can be cut down?" *Id.* On February 6, 2006, Mr. Tatum replied in an e-mail, advising KBC that he would "talk to David Sadoff and get back to you." *Id.*

30.    Because Mr. Tatum had indicated that he was consulting with others on Petitioner's staff regarding ways in which the approximately 370,000 pages of electronic documents could be reduced to a more focused and more manageable volume for review, KBC waited to hear back from the Petitioner's office before beginning to review additional electronic documents.[5] *See* Ex. 29. Petitioner waited over a month before "get[ting] back to" KBC, and even then did not provide any revised search terms that would help narrow the range of potentially relevant electronic documents. Instead, in a March 10, 2006 e-mail, Mr. Tatum asked counsel for KBC to call him "to discuss the current document production status." Ex. 25.

31.    Counsel for KBC expressed his hope that Mr. Tatum's March 10, 2006 e-mail indicated that Petitioner was finally getting back to KBC with the long-awaited refined list of search terms needed to further narrow the range of potentially relevant electronic documents.

---

[5] Of course, this large volume of documents reflects the fact that Petitioner's broad search terms were all in the alternative (A *or* B, not A *and* B). That is, the search of documents returned *every* document containing *any single one* of Petitioner's search terms. And even though Petitioner's investigation is focused on a discrete subcomponent of the friction braking system on Acela passenger cars – the spokes – Petitioner's search terms did not require the term "spoke," or even the term "brake," to be in the resulting documents. Any document including the words "risk" or "condition" or "defect" would be returned by Petitioner's search terms, even if it had nothing to do with Acela brakes. Thus, KBC had every reason to anticipate that Petitioner would re-examine its search terms and devise new ones that would, in fact, meaningfully limit the scope of documents to be produced. Unfortunately, Petitioner ultimately proved to be uninterested in doing so.

Ex. 26.  As counsel for KBC feared, however, that hope proved to be "wishful thinking," as Mr. Tatum simply insisted that "[w]e need to meet ASAP to discuss situation and resolution," without any further elaboration.  *Id.*  After receiving Mr. Tatum's cryptic request for a meeting, counsel for KBC recounted the history of KBC's efforts to work with Petitioner's office to limit the volume of electronic documents to those truly important to Petitioner's investigation of the Acela Brake Spoke Problem.  Ex. 27.  Counsel for KBC explained that "if this means that the Amtrak OIG position is now that all of the electronic Knorr documents initially gathered (i.e., with none of the limiting search terms you previously suggested) are to be produced, then this will require a considerable amount of legal review before we can produce them."  *Id.*

32.    On March 16, 2006, Mr. Tatum responded with a letter acknowledging that he had previously "indicated that I would consider whether or not additional terms could be offered to reduce the number of documents to be reviewed."  Ex. 28.  Despite this acknowledgement, Mr. Tatum suggested that KBC should have immediately proceeded to review documents that might otherwise have been excluded by a more narrowly tailored set of search terms: "Nothing, however, in the aforementioned conversation was meant by me to prohibit or delay your firm's review and production of the documents that resulted from the use of search terms as previously provided by this office."  *Id.*  Left unsaid in Mr. Tatum's letter, of course, was that nothing in those conversations directed, or even *requested*, KBC to begin its review while awaiting more refined search terms.  Mr. Tatum threatened to initiate litigation in federal court against KBC if "all remaining electronic documents" were not produced by April 7, 2006.  *Id.*

33.    On March 23, 2006, counsel for KBC responded to Mr. Tatum's March 16, 2006 letter.  Ex. 29.  In that letter, counsel for KBC explained the apparent "disconnect" between Mr. Tatum and himself over whether KBC would be expected to review documents while Mr. Tatum

was considering new search terms to limit the scope of production.  *Id.*  Counsel for KBC also

explained that the attorney responsible for handling this matter at KBC's parent company, Knorr-

Bremse in Munich, had since departed, necessitating bringing a new Knorr-Bremse in-house

attorney up to speed on the production issues in order to resume legal review and production of

documents.  In light of these circumstances, KBC explained that Mr. Tatum's ultimatum to

produce all 500,000 or so pages of electronic documents remaining no later than April 7, 2006

was unreasonable.  *Id.*

34.     On April 7, 2006, counsel for KBC provided Petitioner with an update on the

status of KBC's production of electronic documents and transmitted the second installment of

electronic documents produced by KBC.  Ex. 30.  This production consisted of 12,443 pages of

documents and, like the previous installment, consisted of a Concordance database, Opticon

image table, and images.  *Id.*  KBC explained that "[n]ow that Mr. Tatum has declined to provide

us with additional search terms to further refine the documents that your office immediately

needs for your investigation, we plan to continue with a rolling production of additional

electronic documents as they are ready for production."  *Id.*

35.     KBC did not receive any correspondence from Petitioner objecting to its second

installment of electronic documents or protesting that the production was not in compliance with

the Subpoena because it did not consist of "native files."  To the contrary, Mr. Tatum

corresponded with counsel for KBC at least twice after receiving this second installment of

electronic documents (via e-mails dated April 21, 2006 and April 24, 2006), without raising a

single complaint about the format of KBC's electronic document production.  Exs. 31, 32.

36.    On April 26, 2006, KBC produced its third and fourth installments of electronic documents.    Ex. 33.    This production consisted of 19,187 total pages and, like previous installments, consisted of a Concordance database, Opticon image table, and images.    *Id.*

37.    On May 5, 2006, KBC produced its fifth installment of electronic documents.    Ex. 34.    This production consisted of 8,911 total pages and, like previous installments, consisted of a Concordance database, Opticon image table, and images.    *Id.*

38.    On May 25, 2006, Mr. Tatum acknowledged receipt of KBC's April 7, 2006 and May 5, 2006 electronic document productions.    Ex. 35.    Although Mr. Tatum's letter specifically addressed KBC's production of its electronic documents, it did not raise any objections to the format in which KBC had been producing its electronic documents or protest that KBC's production was not in compliance with the Subpoena because it did not consist of "native files." *Id.*

39.    On June 6, 2006, counsel for KBC confirmed that KBC would produce a privilege log, but explained that the privilege log would be prepared after the remaining electronic documents had been reviewed and produced.    Ex. 36.    KBC also explained that technical difficulties had arisen that had hindered the accessibility of the database containing KBC's electronic documents to the legal staff in Munich conducting the review of those documents. KBC explained that it was working to address these problems, but that their occurrence had hindered KBC's ability to review and produce documents as rapidly as it had hoped. *Id.*

40.    On June 12, 2006, Mr. Tatum corresponded via e-mail with counsel for KBC about the status of KBC's production of electronic documents.    Ex. 37.    Although Mr. Tatum's e-mail specifically addressed KBC's production of its electronic documents, it did not raise any objections to the format in which KBC had been producing its electronic documents or protest

that KBC's production was not in compliance with the Subpoena because it did not consist of "native files." *Id.*

41.    Counsel for KBC responded to Mr. Tatum's June 12, 2006 e-mail within a matter of minutes, advising Mr. Tatum that an additional production of documents would be forthcoming immediately. Ex. 38.

42.    On June 16, 2006, KBC produced its sixth, seventh, eighth, and ninth installments of electronic documents. Ex. 39. This production consisted of 220,396 total pages and, like previous installments, consisted of a Concordance database, Opticon image table, and images. *Id.*

43.    On June 23, 2006, Petitioner acknowledged receipt of KBC's sixth, seventh, eighth, and ninth installments of its electronic documents. Ex. 40. Mr. Tatum's June 23, 2006 letter imposed a deadline of July 17, 2006 for KBC to complete its electronic document production, but did not object to the format in which KBC's prior document productions had been made. There was no discussion whatsoever in Mr. Tatum's letter about the need for KBC's electronic documents to be produced in "native format" or as "bit stream copies." *Id.*

44.    On July 17, 2006, KBC produced its tenth installment of electronic documents. Ex. 41. This production consisted of 3,354 total pages and, like previous installments, consisted of a Concordance database, Opticon image table, and images. *Id.*

45.    KBC did not receive any correspondence from Petitioner objecting to its tenth installment of electronic documents or protesting that the production was not in compliance with the Subpoena because it did not consist of "native files."

46.    On August 3, 2006, counsel for KBC provided Petitioner with an update on the status of the document production. KBC explained that, although the staff in Munich responsible

for reviewing KBC's documents had been engaged in working on other Acela matters unrelated to the Subpoena, those matters were drawing to a conclusion, and production efforts should accelerate. Pet. Ex. 4. Counsel for KBC estimated production would be complete by September 11, 2006. *Id.*

47.     On September 12, 2006, counsel for KBC sent a letter to Petitioner's counsel, which (i) noted that a comprehensive settlement agreement had been reached by Amtrak and the other parties resolving all underlying issues; (ii) conveyed KBC's belief that its commitments in the settlement and its other efforts to assist Amtrak in getting the Acelas back in service made it unnecessary to spend further time or money producing additional documents; but (iii) expressly solicited Petitioner's response to KBC's belief. Pet. Ex. 7. Petitioner never responded to KBC's September 12, 2006 letter and instead, without prior notice to KBC, filed its Petition six days later, on September 18, 2006. Taking the filing of the Petition as a rejection of KBC's belief that further production was no longer necessary, KBC immediately commenced processing and production of the remaining electronic documents not subject to privilege review.

48.     On November 15, 2006, KBC produced its eleventh installment of electronic documents. Ex. 42. This production consisted of 141,908 total pages and, like previous installments, consisted of a Concordance database, Opticon image table, and images. *Id.*

49.     On November 16, 2006, KBC produced its twelfth installment of electronic documents. Ex. 43. This production consisted of 130,210 total pages and, like previous installments, consisted of a Concordance database, Opticon image table, and images. *Id.*

50.     As of November 22, 2006, KBC had produced a total of approximately 52,996 electronic documents to Petitioner, totaling 591,274 pages. This is in addition to the approximately 42,400 pages of KBC's hard copy documents produced by KBC after their

selection for production by Petitioner's employees from boxes of original files. Sandler Dec. ¶ 10. Thus, all told, KBC has produced over 630,000 pages of documents in response to the Subpoena.

51.    The only documents remaining to be produced by KBC are any documents in the subset of potentially privileged documents (totaling approximately 15,000 pages) that are, upon review, determined not to be privileged. KBC is performing this review now and expects to complete it on or about January 15, 2007. When the review of potentially privileged documents is complete, KBC will produce any non-privileged documents and will provide a privilege log identifying any documents withheld under a claim of privilege.

## IV.    THE PETITION'S FALSE CLAIMS AND UNREASONABLE DEMANDS

52.    The Petition falsely claims that KBC has "refused to produce all e-mail and similar electronic documents." Pet. ¶ 15. KBC has never refused to produce its electronic documents and has, as of the date of this Response, essentially completed its production of electronic documents. KBC is in the process of reviewing the small subset of documents segregated as being potentially privileged, and, when that review is concluded and any non-privileged documents in that subset are produced, KBC will have produced *all* of its non-privileged electronic documents responsive to the Subpoena. Thus, this alleged ground for judicial enforcement of the Petition is moot.

53.    The Petition claims that the Subpoena requires production of electronic documents in their so-called "native format," as "bit stream copies," "unless an alternative production format provides comparable authenticity, content, and usability." Pet. ¶¶ 21-22. As more fully explained in the Memorandum accompanying KBC's Response, KBC's production of electronic documents fully complies with the Subpoena. Moreover, Petitioner accepted ten previous installments of electronic documents without objection or complaint as to their

formatting, with nary a word about a purported "native files" requirement in the Subpoena. Thus, any claim Petitioner could have made that the Subpoena requires production of native files has been waived by its failure to object contemporaneously with KBC's multiple productions of electronic documents.

54.    Petitioner's failure to object to the format of KBC's electronic document productions is understandable, because the format in which KBC produced its documents is actually far more useful for Petitioner's purposes than a "native files" production. As explained in paragraphs 22-24 above and in the accompanying declaration of Joel Sandler, the format in which KBC has produced its electronic documents actually provides *enhanced* searchability and usability compared to a production of native files. Thus, KBC's production of electronic documents represents "an alternative production format [that] provides comparable authenticity, content, and usability" as demanded in the Petition.

55.    The Petition claims that KBC is required to execute a certificate of compliance as part of its obligation to respond to the Subpoena. Pet. ¶ 18. As explained more fully in KBC's accompanying Memorandum, Petitioner lacks the statutory authority to demand a certificate of compliance from KBC. Moreover, the certificate demanded is vague and overbroad and, now that Petitioner has invoked the authority of this Court, is ultimately unnecessary.

56.    Petitioner's demand that KBC generate an index identifying each of the approximately 55,000 documents it has produced and, for each of those documents, designating each of the various document requests in the Subpoena to which it may be responsive, is patently unreasonable and extraordinarily burdensome. Such a requirement would force KBC to conduct a page-by-page review of over 630,000 pages it has produced and would not provide any discernible benefit to Petitioner's investigation. Moreover, the document requests in the

Subpoena are vague, overbroad, and in some cases practically indecipherable, further diminishing the value of the index demanded by Petitioner.

57.     The Petition claims that KBC "has withheld relevant documents responsive to the subpoena without making and supporting a claim of privilege." Pet. ¶ 24.  KBC has not "withheld" any documents, but has previously explained to Petitioner that it was prioritizing production of the documents known not to be privileged before turning to review of the small subset of potentially privileged documents.  KBC has always indicated that it would provide a privilege log identifying documents determined to be privileged and would produce all non-privileged documents responsive to the Subpoena.  KBC is in the process of conducting its review of potentially privileged documents and will generate a privilege log for any documents it withholds under a claim of privilege.  Accordingly, this demand by the Petitioner is moot.

58.     As explained in paragraphs 4-6 above, the document requests in the Subpoena are overbroad, vague and unduly burdensome, and the requests implicate a number of documents that have no bearing on Petitioner's investigation of the Acela Brake Spoke Problem.  Thus, the Subpoena is not entitled to judicial enforcement of its overbroad, vague and unduly burdensome demands.

59.     The Petition is unverified and has no supporting affidavits.  Accordingly, Petitioner has not made the *prima facie* showing required to warrant judicial enforcement of the Subpoena.  Because the Petition is legally deficient, it should be denied.

60.     Moreover, Petitioner has made false and materially misleading statements in an attempt to justify the Petition.  As explained more fully in KBC's supporting Memorandum, Petitioner claims it has evidence that, as early as October 2003, KBC had notice of cracks in brake spokes similar to those discovered in the Acela Brake Spoke Problem. *See* Pet. Mem. at 5-

7. However, the document relied upon by Petitioner to support this allegation does not refer to cracks in brake spokes at all and provides absolutely no support for Petitioner's inflammatory accusation. Moreover, as explained in KBC's supporting Memorandum, Petitioner has made these accusations knowing them to be false. This alone is sufficient to justify this Court's denial of the Petition.

## V.    CONCLUSION

For the foregoing reasons, and as set forth in greater detail in the Memorandum accompanying this response, KBC respectfully requests that this Court deny the Petition and decline to enforce the Subpoena. Petitioner should not be permitted to invoke the authority of this Court to further its abusive investigation that has long since abandoned any sense of reason or restraint.

Dated:    November 24, 2006                    Respectfully submitted,

                                   /s/ John G. DeGooyer
                                   John G. DeGooyer (D.C. Bar No.017970)
                                   FOLEY & LARDNER LLP
                                   3000 K Street, N.W., Suite 500
                                   Washington, D.C.  20007-5143
                                   Telephone 202.672.5300
                                   Facsimile 202.672.5399

                                   *Attorney for Knorr Brake Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2006, true and correct copies of the foregoing Response to the Order to Show Cause Filed October 13, 2006, proposed Order, and the Notice of Electronic Filing thereof were served by first-class mail, postage prepaid, upon:

James E. Tatum, Jr.
NATIONAL RAILROAD PASSENGER CORPORATION
Office of the Inspector General
10 G Street, N.E.
Room 3E-414
Washington, D.C. 20002


/s/ John G. DeGooyer

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                                    |     |                                        |
|------------------------------------|-----|----------------------------------------|
| FRED E. WEIDERHOLD, JR.,           | )   |                                        |
|                                    | )   | Misc. Civil No. 06-0423 (PLF/DAR)      |
|     Petitioner, | )   |                                        |
|                                    | )   |                                        |
|   v.                     | )   | **DECLARATION OF**                     |
|                                    | )   | **JOEL SANDLER**                       |
| KNORR BRAKE CORPORATION,           | )   |                                        |
|                                    | )   |                                        |
|     Respondent. | )   |                                        |
|                                    | )   |                                        |

I, Joel Sandler, pursuant to 28 U.S.C. § 1746, declare that:

1.      I am a Litigation Support Specialist in the Washington, D.C. office of Foley & Lardner LLP ("Foley"). Prior to my experience in Litigation Support, I worked as a litigation paralegal at Foley as well as other law firms. I estimate that I have assisted in approximately five hundred hard copy document productions and approximately two hundred electronic document productions. These productions include approximately one hundred total document productions to government agencies, primarily the Securities and Exchange Commission and the Federal Trade Commission.

2.      I am familiar with and have assisted in the production of electronic documents by Knorr Brake Corporation ("KBC") in response to the administrative subpoena filed by Amtrak's Office of the Inspector General ("OIG"). Between April 2005 and June 2005, I assisted another Foley Litigation Support Specialist with the creation of the electronic production sets and burning the productions to deliverable media. When the Litigation Support Specialist I was assisting left Foley, I assumed primary responsibilities for electronic document productions in the matter. Since that time, I have managed several electronic document productions to the

Amtrak OIG in accordance with direction from Foley's lead attorney on this matter, Mr. John DeGooyer.

3.     To the best of my knowledge, KBC's productions to the Amtrak OIG have each included three primary components: (a) a Concordance database and related system files; (b) a set of branded single-page tiff image files; and (c) an image load file.

4.     The Concordance database is a standard method for delivering and reviewing large amounts of document metadata and searchable document text on a document-by-document basis. It contains information such as email author, email recipient, email sent date, document creator, document creation date and the actual text of the document. It also provides information that allows emails to be related to their attachments and vice versa. The Concordance database is a standard alternative to a delimited text file containing document metadata to be produced. The information is searchable in several ways: full-text searching, Boolean searching, date-restrictive searching, wildcard (partial-word) searching, exclusive searching and field-specific searching. The Concordance databases KBC has produced to the Amtrak OIG have contained the metadata associated with KBC's electronic documents.

5.     The branded set of single-page tiff images is also a standard method for delivering document productions. Using this format, each electronic document is converted to a page-based set of images. For example, a five-page Microsoft Word document would be converted to five tiff image files. For the purposes of the electronic production, KBC assigned each image file a unique production number in the format KBCXXXXXXX. This production number was branded onto the face of the image. The advantage of such a format is that it allows for accurate and dependable tracking of each page of the production. These production numbers were also entered into the corresponding Concordance database as values in the BEGPROD and

ENDPROD fields. This allows for cross-referencing the tiff images and the metadata in the database.

6.    The third component of KBC's production, an image load file, is a standard format for configuring an image viewer such as Opticon or IPRO View to view the tiff images in a document-by-document fashion. The image load file contains information such as where the document breaks occur in the image set, and the page length of each document. If the image viewer such as Opticon or IPRO View is configured properly, the images viewed will correspond to the document metadata being viewed in Concordance. Therefore, you could run a search in Concordance, and the image viewer will display the tiff images corresponding to the search results in a document-by-document format.

7.    There are several reasons why tiff image format is a standard and common format for delivering electronic document productions. The unique branding of a production number allows for reference to be made to a specific portion of the document in a consistent manner. This is the standard method with which documents will be identified in subsequent communication between counsel, depositions and trial. Conversely, identifying specific pages of a native document is difficult at best and impossible in some cases. This is due to the fact that different computer systems may format and paginate the same document differently. For example, a ten-page document on one system may be formatted to read as nine pages on another system. This results in the inability to consistently refer to the exact page in a document in the course of communication during the litigation. This can be problematic in a deposition, for example, when all parties must have a way to locate the same passage of text. Converting the documents to uniquely numbered page-based images eliminates this difficulty.

WASH_1753819.1

8.     A second reason for the standard use of tiff format in the production of electronic documents is that it ensures readability on the recipient's machine. Windows, MAC and UNIX based machines all contain tiff viewing software with the standard operating system package. This compatibility is not ensured when documents are produced in native format. For example, if email were produced in native format, the recipient would need to have access to the email software that created the email, for example Microsoft Outlook or Novell GroupWise, in order to read the emails. These software licenses are prohibitively expensive for the purpose of reviewing a document production.

9.     Additionally, production of documents in image format allows for clear and accurate redaction of privileged or non-responsive information. Current commonplace technology allows for electronic redaction of tiff images, while such technology is not commonplace for native documents.

10.     A tiff image may or may not be searchable, however, it is not a standard practice to deliver searchable tiff images in the course of litigation. Rather, the searchable text and searchable metadata of documents is generally produced in one of three ways: as a standard litigation database (e.g. Concordance), as document- or page-level text files, or as a delimited text file containing data for the entire production range. KBC produced the searchable data in the form of a Concordance database, which allows for various methods of complex searching of both the document text and the document metadata as noted above. While native files are generally text-searchable, the metadata is generally not searchable from the native application. Additionally, without advanced searching tools like Concordance, it is not possible to create linked or Boolean searches of native file documents. Therefore, the ability to search a document

4

production's content is greatly enhanced by the inclusion of the data in a database tool such as Concordance when compared to a production delivered in strictly native format.

11.     The Concordance databases produced by KBC contain all the necessary information to identify documents in index format: production number, document title, document date and document custodian.

12.     As of the date of this declaration, KBC has produced approximately 52,996 electronic documents to the Amtrak OIG, totaling 591,274 pages. This is in addition to the approximately 42,400 pages of KBC's hard copy documents selected for production by Amtrak OIG employees from boxes of original files.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on November 22, at Washington, D.C.

_____
JOEL SANDLER

5

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR.,            )
                                    )
                Petitioner,         )        Misc. Civil No. 06-0423 (PLF/DAR)
                                    )
        v.                          )        **DECLARATION OF**
                                    )        **JOHN G. DeGOOYER**
KNORR BRAKE CORPORATION,            )
                                    )
                Respondent.         )
_____)

I, John G. DeGooyer, pursuant to 28 U.S.C. § 1746, declare that:

1.      I am a partner in the law firm of Foley & Lardner LLP and counsel for Respondent Knorr Brake Corporation ("KBC"). I make this declaration based on personal knowledge and in support of KBC's Response to the Order to Show Cause Filed October 13, 2006 ("KBC's Response").

2.      True and accurate copies of my correspondence to and from attorneys in Petitioner's office regarding KBC's production of documents in response to the Amtrak Inspector General Subpoena Number 05-03 are attached as Exhibits 1-43 to KBC's Response.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on November 24, 2006 at Leesburg, Virginia.

_____
JOHN G. DeGOOYER

WASH_1753957.1