## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRED E. WEIDERHOLD, JR.,     ) | |
|     ) | |
| Petitioner,     ) | |
|     ) | |
| v.     ) | Misc. Civil No. 06-0423 (PLF/DAR) |
|     ) | |
| KNORR BRAKE CORPORATION,     ) | |
|     ) | |
| Respondent.     ) | |

## MEMORANDUM IN SUPPORT OF KNORR BRAKE CORPORATION'S
## RESPONSE TO THE ORDER TO SHOW CAUSE FILED OCTOBER 13, 2006

Respondent Knorr Brake Corporation ("KBC") respectfully submits this memorandum in support of its Response to the Court's Order filed October 13, 2006 ("Order to Show Cause") and in opposition to the September 18, 2006 Petition (the "Petition")[1] filed by Fred E. Weiderhold, Jr., Inspector General of the National Railroad Passenger Corporation ("Amtrak"). For the reasons set forth below, the Petition should be denied.

## INTRODUCTION

The Petition seeks the following relief through the judicial enforcement of the administrative subpoena duces tecum, Subpoena Number 05-03 (hereinafter, the "Subpoena"), issued by Petitioner to KBC:

    1.    prompt, full and complete production of all documents responsive to the Subpoena (Pet. at 2);

---

[1] Citations to the Petition are abbreviated herein as "Pet." Citations to Petitioner's September 18, 2006 Memorandum in Support of Petition for Summary and Expedited Enforcement of Inspector General Subpoenas [*sic*] Duces Tecum are abbreviated as "Pet. Mem." Citations to KBC's Response to the Order to Show Cause Filed October 13, 2006 are abbreviated as "KBC Response."

2.    production of electronic documents as a "bit stream copy" in their so-called "native format," "unless an alternative production format provides comparable authenticity, content, and usability" (Pet. at ¶¶ 21-22);

3.    execution by KBC of a "certificate of compliance" proffered by Petitioner, purportedly to spare Petitioner the need to authenticate or maintain the "chain of custody" of any of the produced documents (Pet. at ¶ 18; Pet. Mem. at 16);

4.    generation by KBC of an index cross-referencing every document produced by KBC (approximately 55,000 documents) with each and every subpoena request to which it could be considered responsive (Pet. at ¶ 23); and

5.    production of a privilege log identifying and describing documents withheld by KBC under a claim of privilege (Pet. at ¶ 24).

As of the date of this memorandum, KBC has produced over 630,000 pages of documents in response to the Subpoena, and its document production is, for all practical purposes, complete. All that remains is for KBC to complete its ongoing review of a small subset of potentially privileged documents in order to produce any of those documents that are determined to be non-privileged and to generate a privilege log for the remaining documents. Thus, Petitioner's first and fifth grounds for enforcement of the Subpoena are moot, or at least will be moot on or about January 15, 2007 when KBC's privilege review is expected to be completed.

As a result of KBC's extensive document production, the most critical issue raised by the Petition, i.e., whether KBC has produced or will produce documents responsive to the Subpoena, has already been resolved. The only remaining issues in dispute between the parties – and the only bases on which the Subpoena now remains to be "enforced" – relate to Petitioner's complaints about the formatting or indexing of documents already produced and Petitioner's demand that KBC execute a vague and unnecessary "certificate of compliance." Petitioner cannot justify judicial enforcement of these purely ancillary demands, which do not advance

Petitioner's investigation in any discernible way, but serve only to burden and harass KBC. Petitioner's harassment of KBC is further evidenced by its knowing misrepresentation to this Court that KBC had prior notice of cracks in Acela brake spoke rotors years before Amtrak discovered them in April 2005.

## DISCUSSION

I.   **KBC'S PRODUCTION OF ELECTRONIC DOCUMENTS IS COMPLETE AND COMPLIES WITH THE SUBPOENA AND THE "GROUND RULES" AGREED TO BY PETITIONER.**

    A.   **KBC's Completion Of Its Document Production Renders Moot Petitioner's Complaint Regarding The Scope Of KBC's Electronic Document Production.**

KBC has already produced all but a fraction of the documents responsive to the Subpoena, including all of its hard-copy documents.[2]  The only documents that have not yet been produced are a small subset of electronic documents that KBC has segregated as potentially privileged.[3]  Having completed the rest of its document production, KBC is now in the process of reviewing these electronic documents and expects to complete its review on or about January 15, 2007.  When KBC completes this review, it will promptly produce any documents determined not to be privileged and will provide a privilege log identifying any documents withheld under a claim of privilege.  Accordingly, the Petitioner's claim that KBC has "refused" to produce all e-

---

[2] Notably, the Petition concedes that KBC has satisfied its obligations with respect to the hard-copy documents, as it alleges only a failure by KBC to produce "all e-mail and similar electronic documents," without mention of any deficiency in production of hard-copy documents.  *See* Pet. at ¶ 15.

[3] The documents segregated as potentially privileged total approximately 15,000 pages.

mails and similar electronic documents is false[4] and, in any event, has in fact been mooted by KBC's production.

**B.    Petitioner's Acceptance Of Many Productions Of Electronic Documents By KBC Without Objection Demonstrates That Petitioner's Claim That The Subpoena Requires Production Of Such Documents In Their "Native Format" Is Spurious**

The Petition incorrectly asserts that the Subpoena requires the production of electronic documents in their so-called "native" format, as "bit stream copies" complete with all "slack space, Master File Table and metadata (information associated with an electronic document that describes its history tracking and management) in exactly the order they appear on the original," not to mention the inclusion of "the same identifying 'hash codes' as the original." Pet. at ¶ 21. Yet, there is not a single reference to any of these terms ("native format," "bit stream copy," "slack space," "Master File Table," "metadata," or "hash codes") in the Subpoena itself. Petitioner has simply manufactured these alleged "requirements" out of whole cloth.

The Subpoena contains a specific instruction regarding the duplication of electronic materials, and that instruction says nothing about producing electronic documents as a "bit stream copy." Instruction 1 of the Subpoena simply directs KBC to "copy all hard drive materials onto a disk or tape and provide these copies." Pet., Ex. 1. The manner by which KBC

---

[4] KBC never refused to produce electronic documents. Presumably, Petitioner relies for this assertion on a September 12, 2006 letter from KBC's counsel to Petitioner's counsel (Pet. Ex. 7), which (i) noted that a comprehensive settlement agreement had been reached by Amtrak and the other parties resolving all underlying issues; (ii) conveyed KBC's belief that its commitments in the settlement and its other efforts to assist Amtrak in getting the Acelas back in service made it unnecessary to spend further time or money producing additional documents; but (iii) expressly solicited Petitioner's response to KBC's belief. Petitioner never responded and instead, without prior notice to KBC, filed its Petition six days later, on September 18, 2006. Taking the filing of the Petition as a rejection of KBC's belief that further production was no longer necessary, KBC immediately commenced processing and production of the remaining electronic documents not subject to privilege review.

has produced its electronic documents fully complies with this instruction. KBC has copied its electronic documents into a Concordance database and has produced a copy of that database to Petitioner on a series of DVDs. This method of production represents the industry standard for large-scale litigation document production and (provided the user understands how to use Concordance or similar document management software) offers search capabilities far superior to those that would be available had KBC produced the "native files" that Petitioner now demands. With the documents produced as TIFF images as part of a Concordance database, Petitioner can use search terms to search within the entire database, not just within individual documents. Even though production of metadata is not required by the Subpoena, the format in which KBC has produced its electronic documents has maintained the metadata associated with each document and allows Petitioner to conduct searches related to the metadata fields. *See* Declaration of Joel Sandler, dated November 22, 2006 ("Sandler Decl.") ¶¶ 4, 10. Thus, the alleged deficiencies in KBC's manner of production of electronic documents cited in the Petition are illusory and reflect an apparent lack of familiarity with standard litigation document management software programs by Petitioner and its staff.

Although KBC's production fully complies with the Subpoena's specific instructions regarding electronic documents, the Petition claims that the express terms of Instruction 1 are somehow trumped by a more general statement in Instruction 7 that KBC is to produce documents "as they have been kept in the usual course of business." Pet. at ¶ 20. Contrary to Petitioner's characterization of this language as a "requirement," Instruction 7 merely *authorizes* (but clearly does not *require*) KBC to produce documents "as they have been kept in the normal course of business." Indeed, Instruction 7 presents production of documents "as they have been kept in the usual course of business" as one of two alternatives for organizing the document

production.   Moreover, because the language cited by Petitioner refers to how groups of documents should be organized or labeled, not how individual electronic documents themselves should be formatted, the language in Instruction 7 of the Subpoena fails to justify Petitioner's demand for "native files."

Perhaps nothing more dramatically illustrates the shortcomings in Petitioner's insistence that the Subpoena clearly requires production of electronic documents in their so-called "native format" than Petitioner's own conduct in response to KBC's document productions prior to the filing of the Petition.  As described in detail in KBC's Response, KBC produced nearly 265,000 pages of electronic documents to Petitioner in ten installments between November 15, 2005 and July 17, 2006.  See KBC Response at ¶¶ 21-45.  KBC has provided the Court with copies of the correspondence between the parties from before, during, and after the production of these ten installments of electronic documents, and nowhere in that correspondence does Petitioner object to or otherwise challenge the *format* of KBC's electronic document production.  See KBC Response, Exs. 1-41.[5]  Indeed, when KBC and Petitioner negotiated the "ground rules" for the production of the electronic documents, KBC made clear that it would *not* be producing the documents as "bit stream copies" or in their so-called "native" format.  One of the inherent problems with producing an electronic document in its "native" format is that the pages of the document cannot be Bates numbered, which makes the document and its component pages difficult to track or cite in complex civil litigation.  Sandler Decl. ¶ 7.  From the very outset of discussions regarding KBC's production of electronic documents, however, KBC advised

---

[5] Petitioner's correspondence with KBC between September 2005 and the filing of the Petition in September 2006 frequently criticizes perceived deficiencies in the *pace* or *volume* of KBC's production of electronic documents, but never the *format* in which the electronic documents were produced.  And, as demonstrated in Section I.A. above, any of Petitioner's complaints about the pace or volume of KBC's document production are now moot.

Petitioner that it would be processing the electronic documents with Bates numbers and protective legends – a process inconsistent with producing the documents as "bit stream copies" or in their "native" format. *See* KBC Response ¶¶ 17-20; KBC Response Exs. 11, 14, 17.

KBC made its intention not to produce electronic documents as "bit stream copies" or "mirror images" of the "native" files even more explicit in its September 22, 2005 letter to Petitioner. KBC Response Ex. 14. In response to a request from Mr. Tatum of Petitioner's office the day before, KBC's September 22, 2005 letter confirmed that (i) after KBC's review and processing, the electronic documents produced would be provided to Petitioner on DVDs; and (ii) the attachments to e-mails would appear immediately following the e-mails to which they are attached, with the possible exception of video files, which KBC indicated might be produced on a separate DVD. *Id.* Significantly, KBC's September 22, 2005 letter did not mention "native files," "metadata," "hash codes," or "bit stream copies" of the electronic documents. To the contrary, KBC would not have needed to provide details regarding how e-mail attachments would be produced if either the Subpoena or Petitioner's staff had insisted upon production of the electronic documents in their "native format."

Even if Petitioner somehow failed to recognize that the processes described by KBC were inconsistent with production of "native files," Petitioner clearly understood that it was not receiving "bit stream copies" of the electronic documents once the "rolling production" of KBC's electronic documents began in November 2005. Yet, not once between November 2005 and the filing of the Petition on September 18, 2006 did Petitioner assert to KBC that the Subpoena required production of the electronic documents in their "native" format. To the contrary, Petitioner accepted ten installments of electronic documents, totaling nearly 265,000

pages, without objection or complaint. Thus, Petitioner's own conduct prior to the filing of the

Petition belies its claim that the Subpoena has always required production of "native files."

## II. PETITIONER'S UNREASONABLE DEMANDS AND FACTUAL MISREPRESENTATIONS TO THIS COURT WARRANT DENIAL OF ITS PETITION.

In providing for judicial enforcement of administrative subpoenas, "Congress intended

that judges should not merely rubber-stamp the subpoenas that come before them." *Dow*

*Chemical Co. v. Allen*, 672 F.2d 1262, 1266 (7th Cir. 1982). Instead, a court must determine

whether "the inquiry is within the authority of the agency, the demand is not too indefinite and

the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. 632,

652 (1950). Even when the proponent of an administrative subpoena can meet those standards,

however, "it is also clearly recognized that disclosure may be restricted where it would impose

an unreasonable or undue burden on the party from whom production is sought." *Dow, supra*,

672 F.2d at 1267.

Petitioner argues that a heavy burden shifts to the party contesting enforcement "[o]nce a

prima facie showing has been made." Pet. Mem. at 15. Yet, Petitioner fails to recognize that it

has failed to make such a *prima facie* showing. In fact, as an evidentiary matter, Petitioner has

failed to make *any* showing at all. Petitioner has failed to verify the allegations of the Petition

with any supporting affidavits, as is required of an agency seeking judicial enforcement of an

administrative subpoena. *See, e.g., SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 128

(3rd Cir. 1981) (en banc) ("[t]he agency seeking enforcement must first file a complaint alleging

compliance with the [*United States v.*] *Powell* standards and an affidavit of the agent who issued

the subpoena verifying the allegations"). Petitioner itself acknowledges the need to support its

Petition with affidavits, as it cites the case of *United States v. Comley*, 890 F.2d 539, 541 (1st Cir.

1989), for the proposition that courts generally accept affidavits as sufficient to make out a *prima*

*facie* case for enforcement. Pet. Mem. at 15-16. In the absence of any supporting affidavits, the Petition patently fails to make out a *prima facie* case for enforcement, and there is thus *no* burden on KBC to provide any rebuttal. The Petition's lack of evidentiary support renders it fatally deficient and precludes judicial enforcement of the Subpoena in this proceeding.

Beyond the obvious – and fatal – evidentiary deficiencies underlying the Petition, the demands Petitioner seeks to have judicially enforced are unnecessarily burdensome, not reasonably relevant to Petitioner's investigation, and, in the case of the certificate of compliance, not within Petitioner's authority. These additional flaws provide yet another basis for denying judicial enforcement of the Subpoena.

### A.     The Certificate Of Compliance Demanded By Petitioner Is Vague, Beyond Petitioner's Statutory Authority, And Ultimately Unnecessary.

Petitioner seeks judicial enforcement of the Subpoena's requirement that KBC execute a certificate attesting, under penalty of perjury, that the materials it has produced in response to the Subpoena "are genuine, complete and in full compliance with the demand made in the subpoena for the materials specified therein." Pet., Ex. 1. While KBC has no general qualms with certifying that the materials it has produced are genuine, Petitioner's history of reinterpreting the Subpoena in a manner that is inconsistent with its literal text, as well as with the prior practice of the parties, gives KBC understandable pause in executing the certificate proffered by Petitioner.

The Court need look no further than Petitioner's revisionist claim that KBC has always been obligated to produce its electronic documents in their "native" format to see how Petitioner could make mischief with such a vague certification. For instance, months after KBC had produced ten installments of electronic documents without complaint or objection by Petitioner, Petitioner now claims both that those productions were not "complete" (because they allegedly failed to contain all the metadata, slack space, Master File Table, and hash codes that a "bit

stream copy" would include), and that those productions were not "in full compliance with the demand made in the subpoena" (because they were not "mirror image" or "bit stream copy" files). Though it is not clear from Petitioner's argument, it is also entirely possible that Petitioner would now argue that the thousands of electronic documents it accepted from KBC without objection in earlier productions are also not "genuine," since they are not the now-desired "bit stream copies."

Curiously, Petitioner claims that the purpose of the certification is to spare its staff "the clerical tasks required to establish and maintain the authenticity and the 'chain of custody' of the produced documents." Pet. Mem. at 16. This argument is simply nonsense. Even if KBC were to execute the proffered certification, Petitioner would still be tasked with "maintain[ing] the authenticity" of any document produced by KBC by demonstrating that it had not been altered since the document's authenticity was certified by KBC. Ironically, it would be more difficult to establish that an electronic document produced by KBC had not been altered (and was, therefore, still "authentic") if KBC were forced to produce the document in its "native" (and, therefore, editable) format than if KBC produced the document (as it has done) as a static TIFF image bearing a Bates number and the restrictive legend.

In addition to failing to articulate a valid justification for requiring a certificate, Petitioner cannot identify any valid legal authority for its request. Recognizing that the statutory provision authorizing Petitioner to issue subpoenas (Section 6(a)(4) of the Inspector General Act) provides no authority for a certificate of compliance, Petitioner contends that it is authorized to require certifications from a subpoenaed party pursuant to Section 6(a)(5) of the Inspector General Act, 5 U.S.C. App. 3 § 6(a)(5). Citing Section 6(a)(5)'s authorization of the Inspector General "to administer to or take from any person an oath, affirmation, or affidavit," Petitioner draws a false

parallel between an affidavit and its proffered certificate of compliance: "[t]he certification, like an affidavit, is *a statement of fact*." Pet. Mem. at 16 (emphasis added). Despite Petitioner's claim, its proffered certificate is not "a statement of fact," but is rather a statement of a legal conclusion (*i.e.*, that the produced documents are "in full compliance with the demand made in the subpoena"). Thus, the certificate is not akin to an affidavit and is not authorized by either Section 6(a)(4) or Section 6(a)(5) of the Inspector General Act.

Requiring the execution of the certificate is not only beyond Petitioner's statutory authority, but is also unnecessary now that Petitioner has invoked the jurisdiction of this Court to enforce the Subpoena. This Court will ultimately decide whether the requirements of the Subpoena are enforceable and, if so, to what extent KBC has complied with those requirements.

**B.      Petitioner's Demand That KBC Generate An Index Cross-Referencing Every Document It Has Produced With Each Subpoena Request To Which It May Be Responsive Is Unduly Burdensome and Abusive.**

Petitioner asks this Court to order KBC to generate an index in which, for each of the approximately 55,000 documents it has produced, KBC would "identify to which specific subpoena request said document responded." Pet. at ¶ 23. KBC has produced over 630,000 pages of documents. It would be impossible for KBC to produce the index demanded by Petitioner without conducting a page-by-page review of the documents it has already produced. Even if that review could be accomplished at the rate of 30 seconds per page, it would take a total of *more than 5,000 hours* to complete such an index. Thus, the order requested by Petitioner would impose an extraordinarily unreasonable burden on KBC, yet Petitioner has failed to articulate a single justification for imposing this burden. Petitioner simply avers that KBC "was obligated under the Instructions of the subpoena" to produce such a burdensome index (Pet. at ¶ 23; Pet. Mem. at 13), and that the production of such an index is mandated by Federal Rule of Civil Procedure 34(b). Pet. Mem. at 24-25. Nowhere in the Petition or the

accompanying materials does Petitioner offer a plausible explanation as to how an index cross-referencing each document to the subpoena requests would benefit Petitioner's investigation in any way.

Indeed, the document requests in the Subpoena are so broadly worded and poorly defined as to make the index demanded by Petitioner essentially useless. The document requests overlap to such an extent that the index demanded by the Subpoena would not distinguish the individual documents in a meaningful way. For example, the KBC document attached as Exhibit 6 to Petitioner's Memorandum would be responsive to subpoena requests 4, 5, 6, 7, 8, 10, 12, and arguably 11. Under these circumstances, Petitioner's demand for an index is "extremely and unnecessarily burdensome" and should be denied. *See, e.g.*, *United States v. Poindexter*, 727 F.Supp. 1470, 1485-86 (D.D.C. 1989) (finding, in context of document production in a criminal case, that "the demand for identification of each document according to the specific request to which it is responsive would be extremely and unnecessarily burdensome," particularly because "any one document may be responsive to numerous different requests").

C.    **Petitioner Has Not Explained How Its After-The-Fact Demand For "Bit Stream Copies" Of KBC's Electronic Documents Will Assist Its Investigation.**

In Section I.B., above, KBC demonstrated that Petitioner lacks any basis to support its recent claim that the Petition requires production of "bit stream copies" of electronic documents. The Subpoena simply does not require such a manner of production, a fact confirmed by Petitioner's conduct in accepting ten installments of electronic documents without raising any objection that they were not produced as "bit stream copies." Even if Petitioner had raised such an objection during the course of document production, however, it would still be unable to justify judicial enforcement of its "native files" demand. One of the predicates for judicial enforcement of a subpoena is that the information sought by the subpoena is "reasonably

relevant" to the investigation. *Morton Salt, supra*, 338 U.S. at 652. Petitioner has not articulated how the information it would obtain through production of electronic documents as a "bit stream copy" – the "hash codes," "slack space," and "Master File Table" – is at all relevant to its investigation.

### D.    Petitioner's Misrepresentations Demonstrate That Its Investigation Has Become Abusive And Justify Denial Of The Petition.

After eighteen months of investigation and the production of approximately *two million* pages of documents by the subpoenaed parties, Petitioner apparently still cannot muster a single piece of evidence to support its now thoroughly discredited theory that KBC or the other subpoenaed parties had any advance knowledge of, or notice regarding, cracks in disc brake rotor spokes on the Acela trainsets, which is a purported focus of Petitioner's investigation. *See* Pet. at ¶ 11. Instead, Petitioner attempts to mislead this Court by misrepresenting three Failure Analysis Reports ("FARs") as evidencing KBC's alleged discovery of a "similar defect" to the cracked disc brake rotor spokes Petitioner has been investigating. *See* Pet. Mem. at 7, Ex. 6.

Through the headings of its Memorandum in support of the Petition, Petitioner represents that KBC discovered cracked spokes on Acela disc brake rotors "[i]n October 2003, or earlier." For example, Section II.A. of Petitioner's Memorandum is titled "Discoveries of Cracked Spokes on Acela Disc Brake Rotors." Subsection 1 under this heading is titled "By Federal Railroad Administration personnel on the evening of April 14, 2005." Subsection 2 under the same heading is titled "*In October 2003, or earlier, by Respondent*," clearly representing that KBC had discovered "cracked spokes on Acela disc brake rotors" at that time – a representation that has no basis in fact. *See* Pet. Mem. at 5-7 (emphasis added). Petitioner makes this accusation even more explicit in the body of its Memorandum: "as early as October 2003, at least eighteen (18) months before Mr. Thomas discovered *cracks in the disc brake rotor spokes*, Respondent

discovered *a similar defect* on three Acela disc brakes." Pet. Mem. at 7 (emphasis added). As evidence to support this allegation, Petitioner offers the three FARs, Pet. Mem. Ex. 6, none of which describes cracks in the disc brake rotor spokes. Instead, these FARs describe the discovery of a far more common type of crack: an "incipient crack" in the disc surface. *See* Pet. Mem. at 7, Ex. 6. Despite the absence of any mention of the disc brake rotors or spokes anywhere in the October 30, 2003 FARs, Petitioner asserts that "Amtrak was not informed that incipient cracks occurring as the result of a manufacturing defect *had been discovered on Acela disc brake rotors.*" Pet. Mem. at 7 (emphasis added).

Most importantly, Petitioner well knows that the FARs it proffers as evidence have nothing to do with the disc brake rotor spoke cracks under investigation. Indeed, any possible ignorance or confusion Petitioner once could have claimed on that score was dispelled *more than a year ago* by Bombardier, Alstom, and NeCMSC in their Memorandum in Support of a Hearing (hereinafter, "Bombardier Original Petition Response"), dated October 20, 2005, which those parties submitted to Petitioner in an effort to show that many allegations in the Petition filed September 22, 2005 in Misc. Civil No. 05-376 (including the ones about advance knowledge of, or notice regarding, cracks in disc brake rotor spokes) were false. *See* Bombardier's Response and Cross-Claim filed October 6, 2006 in Misc. Civil No. 05-376 (a related case also before this Court), which attached and incorporated by reference the Bombardier Original Petition Response.

Attached to the Bombardier Original Petition Response was the declaration of Denis Oakes, a train systems and integration engineer employed by Bombardier, who explained that references to cracks discovered in disc brake spokes are easily distinguishable from references to

cracks discovered on the friction surface of the brake discs. A copy of Mr. Oakes' declaration, and the documents he reviewed, are attached hereto as Exhibit A.

Mr. Oakes pointed out to Petitioner that cracks on the friction surface of the disc brakes "are not considered to be a problem, unless their size exceeds the limits set by the brake manufacturer." Oakes Decl. ¶ 9. Mr. Oakes further identified several factors that would demonstrate that a reference to a crack could not possibly be referring to a spoke crack, including the following: (i) any reference to whether the dimensions of a crack are within permissible limits cannot refer to a spoke crack, because there are no permissible limits for spoke cracks (all spoke cracks are impermissible); and (ii) the term "incipient crack" is defined and used in the maintenance and inspection manuals to refer to cracks in the friction surface and thus cannot refer to a spoke crack. Oakes Decl. ¶ 13.

The information that Mr. Oakes provided to Petitioner more than a year ago makes clear that the FARs in Pet. Mem. Ex. 6, which use the same language as those that were the subject of Mr. Oakes' declaration, refer exclusively to cracks in the friction surface of the disc brake – not to cracks in the spokes.

After receipt and review of the Bombardier Original Petition Response and Mr. Oakes' declaration, Petitioner filed an Amended Petition in Misc. Civil No. 05-376 on August 11, 2006. Significantly, Petitioner made no allegation in that Amended Petition of advance knowledge of, or notice regarding, cracks in disc brake rotor spokes, thus abandoning those false claims. *See* Amended Petition Misc. Civil No. 05-376. Yet, on September 18, 2006, only five weeks later, Petitioner filed its Petition in this case accusing KBC of having advance knowledge of, or notice regarding, cracks in disc brake rotor spokes, knowing such accusation to be false.

Equipped with Mr. Oakes' explanation, as well as Petitioner's familiarity with the respective components of the Acela brake systems derived from eighteen months of investigation into the narrow issue of spoke cracks in Acela disc brakes, Petitioner's misrepresentation of the facts underlying the October 30, 2003 KBC report, Pet. Mem. Ex. 6, is particularly egregious and inexcusable. This misrepresentation, without more, warrants this Court's dismissal of the Petition.

## CONCLUSION

For all of the foregoing reasons, the Petition should be dismissed.

Dated:      November 24, 2006                    Respectfully submitted,


/s/ John G. DeGooyer
John G. DeGooyer (D.C. Bar No.017970)
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5143
Telephone 202.672.5300
Facsimile 202.672.5399

*Attorney for Knorr Brake Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2006, true and correct copies of the foregoing Memorandum in Support of Knorr Brake Corporation's Response to the Order to Show Cause Filed October 13, 2006, proposed Order, and the Notice of Electronic Filing thereof were served by first-class mail, postage prepaid, upon:

> James E. Tatum, Jr.
> NATIONAL RAILROAD PASSENGER CORPORATION
> Office of the Inspector General
> 10 G Street, N.E.
> Room 3E-414
> Washington, D.C.  20002

/s/ John G. DeGooyer

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR.,
    AS INSPECTOR GENERAL,
    NATIONAL RAILROAD PASSENGER
    CORPORATION

           Petitioner

           v.

BOMBARDIER, INC.

ALSTOM TRANSPORTATION, INC.

NORTHEAST CORRIDOR MAINTENANCE
    SERVICES COMPANY

           Respondents.

Misc. Civil No. 1:05-mc-00367-PLF

**DECLARATION OF
DENIS OAKES**

I, DENIS OAKES, pursuant to 28 U.S.C. § 1746, declare that:

    1.    I am a Project Engineer at Bombardier Transportation, a group of Bombardier Inc., the ultimate parent company of Bombardier Corporation (collectively "Bombardier"). I make this declaration in support of Alstom Transportation's ("Alstom"), Bombardier's and Northeast Corridor Maintenance Services Company's ("NeCMSC") (collectively "Respondents") Response to the Petition (the "Petition") of Fred E. Weiderhold, Jr., as Inspector General, National Railroad Passenger Corporation ("Amtrak").

    2.    I am a train systems and integration engineer, who has developed an expertise in the brake system. I have been responsible for selecting, creating interfaces for, and testing the brake system of many different vehicles, including the Acela trainsets.

3.    I have been employed by Bombardier since May 1982. From 1996 through October 2000, I was a Project Engineer on the Acela project. From November 2000 through December 2002, I was primarily working on a different project, but remained in close contact with my temporary replacement on the Acela project and continued to be kept informed on major issues relating to the Acela brakes. In January 2003, I formally resumed my role on the Acela project and continued my work in connection therewith through the end of January 2005. (Although my own involvement ended at that time, Acela brake issues continued to be reported to and handled by Pierre Miclette and Sylvain Labbé.) In April 2005, after the Acela service was suspended due to the broken spoke problem, I again resumed my role on the Acela project. I am therefore familiar with the facts and circumstances surrounding the events described in this declaration. Unless otherwise noted, this declaration is based on personal knowledge.

**Bombardier's Lack of Notice**

4.    Because of my role on the Acela project, I am routinely notified, through both formal and informal channels, of any problems with the brakes (other than one-time problems such as those caused by improper handling, for instance if a brake component is inadvertently dropped on the shop floor at NeCMSC). For instance, I am one of the core group of Bombardier employees responsible for making sure that Knorr addresses out-of-limit cracks on the friction surface of the brake discs. Accordingly, I would have been notified of any issues relating to broken spokes.

5.    Prior to April 14, 2005, I was unaware of any defective, cracked or broken spokes ("Spoke Issues") on the Acela trains.

6.    After April 14, 2005, I reviewed my files to see if I had ever received any documents that might have put me on notice of any Spoke Issues. I found no such documents.

7.    I am unaware of any documents that might have put Bombardier on notice of any Spoke Issues prior to April 14, 2004.

**Brake Discs and Spoke Cracks**

8.    The diagram below (a copy of which, I understand, appears in Exhibit 10 of Mr. Weiderhold's Petition) shows an axle-mounted friction brake disc. On the Acela trainsets, this type of brake disc is found only on the trailer car friction brakes. The other brakes on the Acela trainsets (*i.e.*, the electric brakes, which use electricity rather than friction, and the power car friction brakes, which are wheel-mounted rather than axle-mounted) do not have spokes.



1 - Friction ring
2 - Connection Spokes
3 - Hub

9.    Cracks in the "friction ring" (also known as the "friction surface" or the "friction plate") are due to the temperature gradient resulting from the heating, generated by the contact between the brake pads and the friction ring, and the cooling of the ring. They are not

considered to be a problem, unless their size exceeds the limits set by the brake manufacturer. (By contrast, the manufacturer has not set any specific size limits for spoke cracks.)

10. Thermal cracks on the friction surface are known and expected by the Amtrak employees inspecting and maintaining the Acela cars under the supervision of NeCMSC. In fact, prior to April 2005, when Amtrak personnel maintaining the Acela referred to a "cracked disc," it was understood that they were referring to cracks in the friction surface. By contrast, if there were a crack in any other part of the brake disc, such as the spoke, the hub, or the cooling fins, the crack would have been described by reference to that part of the disc (e.g., a "spoke crack" or "crack in the hub" or a "cracked fin").

**Communications With Knorr Regarding Cracked Brake Discs**

11. I drafted the document 041-ISL-2420, dated November 15, 2004 (the "Cracked Brake Discs Memorandum"), which I understand is attached as Exhibit 12 to Mr. Weiderhold's Petition.

12. None of the cracks that I identified or referred to in the Cracked Brake Discs memorandum or its attachment, "Cracked Disc List Rev_02", involved cracks on the spokes. They were all reported to me as cracks on the friction surface.

13. This is apparent from a reading of most of the individual line items of Cracked Disc List Rev_02. It is clear on the face of the document, without even looking up the applicable Failure Analysis Reports or Corrective Work Orders, that at least 36 of the 46 cracks cannot possibly be spoke cracks:

a. Many entries refer to whether or not the dimensions of the crack are within permissible limits. Because there are permissible limits for surface

4

cracks, but not for spoke cracks, there is no reason to mention the size of a spoke crack; all such cracks are impermissible.

b.      The power car brake discs (*e.g.,* items where the "Equipment Code" starts with the number "2", or items referencing "bolt holes" or the "bolt countersink") do not have spokes.

c.      The terms "heat crack" and "thermal crack" describe cracks in the friction surface, not spoke cracks.

d.      Similarly, the terms "incipient crack" and "penetrating crack" are defined and used in the maintenance and inspection manuals to refer to cracks in the friction surface.

14.    In my experience, it is unlikely that engineers or maintenance personnel on the Acela project would describe a spoke crack as appearing on the "side"; "left side"; "inner side"; "1/4" from edge"; "on edge"; "surface"; or "on surface" without specifically stating that the crack is related to the spoke.  Ordinarily, they would likely describe the location of a spoke crack as on the "spoke surface" or the "spoke web".  By contrast, they would utilize words such as "surface" (without additional qualifiers) to describe the friction surface.

15.    Bombardier has repeatedly expressed its concern to Knorr Brake Corporation ("Knorr") about out-of-limit friction surface cracks through both formal and informal channels. Knorr addressed some, but not all of the issues raised in the Cracked Brake Discs Memorandum, by providing Failure Analysis Reports.  None of Knorr's communications in response to the Cracked Brake Discs Memorandum ever made any mention of cracked or broken spokes.

**Communications With Faiveley, ORX, Wabco, Wabtec, and Sab Wabco**

16.    I do not ordinarily communicate directly with Respondents' subcontractors, including Knorr and ORX, or with any of Knorr's subcontractors or sub-subcontractors, including Faiveley Transport, Wabco, Wabtec, and Sab Wabco.

17.    Prior to April 14, 2005, I did not have any communications with ORX, Knorr, Faiveley Transport, Wabco, Wabtec, or Sab Wabco with respect to cracked spokes on the Acela project.

18.    Prior to September 22, 2005, I had never seen the "Confidential!" March 16, 2005 Faiveley Transport memorandum, which I understand is attached as Exhibit 11 to Mr. Weiderhold's Petition (the "Faiveley Memorandum").

19.    I was entirely unaware of the substance of the Faiveley Memorandum before Mr. Weiderhold filed his Petition.

20.    I am not aware of anyone else at Bombardier who had knowledge of the Faiveley Memorandum before Mr. Weiderhold filed his Petition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on October __, 2005 at St-Bruno, Québec, Canada.

Denis Oakes

6

November 16, 2004
O/R: 041-BO/KB-2191



E-mail: paula.charms@knorrbrakecorp.com

**BOMBARDIER**
*TRANSPORTATION*

Bombardier Inc.
1101 Parent Street
Saint-Bruno, Quebec, Canada J3V 6E6
Telephone 1(450) 441-3043
Fax 1(450) 441-9124
http://www.transportation.bombardier.com

Mr. Joseph De Stefano
Knorr Brake Corporation
861 Baltimore Blvd
Westminster, MD 21157
U.S.A.

*Added        JB*
*GS & SA    KET    RTB*
*            MK    AL*
*            DM    PT*
*            TW    JMD*
*            EW    CT*
*                NW/C*

Subject: **Cracked Brake Discs**

Dear Mr De Stefano:

Please find attached the memorandum 041-ISL-2420 for your review and actions.

Should you have any questions or require additional information, do not hesitate to contact the undersigned.

*Action*

Sincerely yours,

*#322    CT - FARS*

*Due*
*12-17-04*
*See Detail*
*Sheet*

Anick Tourigny
Purchasing Agent
Saint-Bruno

AT/at

Action:   Open
Code:     32.19

c.c.:     Denis Oakes, Gaétan Slater

Encl :    Cracked Disc List Rev_02.doc



**BOMBARDIER**
*TRANSPORTATION*

# *Memorandum*

| | | | |
|---|---|---|---|
| **To** | : | Anick Tourigny | **041-ISL-2420** |
| | | | **November 15, 2004** |
| **From** | : | Denis Oakes | |
| **c.c.** | : | Gaétan Slater        Pierre Miclette | |
| **Subject** | : | Cracked Brake Discs | |
| **Attachments** | : | Cracked Disc List Rev_02 | |
| **Reference:** | | | |

Anick,

---

Please transfer the following information to Knorr.

Please find attached, the corrective work order (cwo) list in regards with cracked brake Discs. The list is sorted by Trainset & Car numbers.

<u>Referring to the attached list:</u>
- Cracks that were found to be within limits are identified in black text:        17
- **Cracks that lead to axle replacement are identified in red text:**        **27**
   **(Feedback from Knorr is requested)**
   (Open FARs are identified in yellow highlight)
- Cracks to be monitored by NecMsc are identified in green text:        2
- Total:        46

Among the 27 cwo that lead to axle replacement, only the discs under FAR can be easily linked to the disc serial # listed below as follows:
- Discs that are covered by open FAR:        7
- Discs that were sent from ORX to Knorr on October 19th without FAR:        13
   (According to Dan from ORX)
- Discs that serial number is not available:        7



20 cracked discs can be tracked as follows:

| FAR # | Disc Serial # | Comment |
|---|---|---|
| 15800 | ??? | July 27, 04; Cheek Disc |
| N/A | 040305 | Sent from ORX on October 19 |
| N/A | 090033 | Sent from ORX on October 19 |
| 15698 | 209902 | Oct 17, 04 |
| N/A | 279912 | Sent from ORX on October 19 |
| N/A | 309913 | Sent from ORX on October 19 |
| N/A | 309914 | Sent from ORX on October 19 |
| N/A | 310008 | Sent from ORX on October 19 |
| N/A | 339922 | Sent from ORX on October 19 |
| 15700 | 339939 | Oct 10, 04 |
| 15699 | 339940 | Oct 23, 04 |
| N/A | 339958 | Sent from ORX on October 19 |
| N/A | 399914 | Sent from ORX on October 19 |
| N/A | 499905 | Sent from ORX on October 19 |
| N/A | 509902 | Sent from ORX on October 19 |
| 15756 | 509904 | Nov 1, 04 |
| N/A | 587410 | Sent from ORX on October 19 |
| N/A | 587640 | Sent from ORX on October 19 |
| 15669 | 638411 | Sept 15, 04; Sent from ORX on October 19 |
| 15670 | 693332 | Sept 15, 04 |

Please provide failure report for these 27 cracked discs.

Do not hesitate to contact the undersigned for further details.

Yours truly,


Denis Oakes P. Eng.
Project Engineer, System Engineering
**Mass Transit - North America**

Code    :    12.0
Status    :    Open

ISL-2420 Cracked Disc list Rev 02.doc

## CRACKED DISC

| Wheel Set | Web Status | Present Engineering Code | Present Wheel Code | Source | Description | Recommendation | Work Order Package / Assessment | Requested In Date | Last printed By | Last printed Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 70947 | Closed | TS-01 | 2018 | ICCS | CRACKS ON BRAKE DISK L3 DISCOVERED-INSPECT | | within limits | 04/13/03 12:23AM | QHARDY | 04/13/2003 12:26AM |
| 70948 | Closed | TS-01 | 2018 | ICCS | CRACKS ON BRAKE DISK L1 DISCOVERED-INSPECT | | within limits | 04/13/03 12:27AM | QHARDY | 04/13/2003 12:28AM |
| 96457 | Closed | TS-01 | 3405 | SSY | R1 BRAKE DISC CRACK BEYOND LIMIT | L1 BRAKE DISC CRACK BEYOND LIMIT | REPLACED WHEELSET | 06/29/04 08:08AM | JAGBEMATU | 06/29/2004 09:56AM |
| 69332 | Closed | TS-02 | 3526 | ICCS | INSIDE DISK "R" SIDE, INCIPIENT CRACKS NOTED | | None of the cracks exceed the limits for disc cracks, serviceable as per 4.2.1, will continue to monitor disc | 03/27/03 05:02AM | MGRAVER | 03/27/2003 05:05AM |
| 84280 | Closed | TS-03 | 3402 | SSY | CRACK ON INNER SIDE OF OUTER DISK @L4 | INSPECT | INSPECTED BY QMP AND FOUND TO BE WITHIN ACCEPTABLE LIMIT | 11/08/03 04:37PM | JAGBEMATU | 11/10/2003 03:01PM |
| 97451 | Closed | TS-03 | 3504 | SSY | AXLE #2 HAS A CRACK ON R2 DISC FAR: L4605 | REPLACE AXLE # 2 WHEELSET | REPLACED AXLE #2 WHEELSET Casting Slag <100mm. | 07/21/04 10:03AM | JAGBEMATU | 07/21/2004 04:59PM |
| 103062 | Open | TS-03 | 3520 FAR-L5756 | SSY | CRACK AND CHIP ON DISC @3 1/4" FROM EDGE | PENETRATING CRACK AT BRAKE DISC R3 | | 11/01/04 06:30AM | | |
| 84281 | Closed | TS-03 | 3520 | SSY | | INSPECT | INSPECTED BY QMP AND FOUND TO BE WITHIN ACCEPTABLE LIMIT | 11/08/03 04:37PM | JAGBEMATU | 11/10/2003 03:11PM |
| 96458 | Closed | TS-03 | 3520 | SSY | L2 BRAKE DISC CRACK BEYOND LIMIT | L2 BRAKE DISC CRACK BEYOND LIMIT | REPLACED WHEELSET | 06/29/04 08:11AM | JAGBEMATU | 06/29/2004 01:09PM |
| 96460 | Closed | TS-03 | 3520 | SSY | L3 BRAKE DISK CRACK BEYOND LIMIT | L3 BRAKE DISK CRACK BEYOND LIMIT | REPLACED WHEELSET | 06/29/04 08:16AM | JAGBEMATU | 06/29/2004 01:26PM |
| 98760 | Closed | TS-04 | 3401 | SSY | AXLE #1 & 2 WHEELSETS HAVE THERMAL CRACKS | REPLACE AXLE #1 & 2 WHEELSETS DUE TO THERMAL CRACKS | REPLACED AXLE #1 & 2 WHEELSETS DUE TO THERMAL CRACKS | 08/14/04 10:15AM | JAGBEMATU | 08/15/2004 05:36PM |
| 89161 | Closed | TS-04 | 3508 | SSY | L2 DICS CRACKED BEYOND LIMITS | L2 DICS CRACKED BEYOND LIMITS | REPLACED AXLE 2 WHEELSET DUE TO CRACKED L2 DISC(S)N OF INSTALLED AXLE:014-J7112SN OF INSTALLED L2 WHEEL:7151125N OF INSTALLED R2 WHEEL: | 02/07/04 04:11AM | JAGBEMATU | 02/08/2004 02:39PM |

ISL-2420 Cracked Disc list Rev_02.doc

| Work Order | WO Status | Permt Equip Code | Equipment Code | Facility ID | Work Order Title | Job Description | Work Order Job Note | Requested By Date | Last Updated By | Last Update Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 70423 | Closed | TS-05 | 2009 | ICCS | L3 BRAKE DISC CHEK IS DEVELOPING CLUMPS OF HEAT CRACKS NEXT TO BOLT COUNTERSINK | | 13522 | 04/08/03 02:15PM | | |
| 70942 | Closed | TS-05 | 2009 | ICCS | SURFACE CRACKS DISCOVERED ON BRAKE DISK L3-INSPECT | | cracks measure within tolerance IAW 4.2.10.25 | 04/12/03 11:51PM | QHARDY | 04/12/2003 11:54PM |
| 89859 | Closed | TS-05 | 2009 | ICCS | L3 AND R4 CHEEK DISC HAVE HEAT CRACKS FORMING | | Check disc show signs of heat cracking but are well within limits | 02/19/04 05:12AM | WVULJO | 02/19/2004 05:14AM |
| 102265 | Closed | TS-05 | 3546 | SSY | AXLE #4 WHEELSET HAS A CRACKED DISK. FAR: 15698 | REMOVED AND REPLACED WHEELSET FROM STOCK | AXLE #4 WHEEL SET WAS REPLACED | 10/17/04 10:01AM | JAGBEMATU | 10/17/2004 04:42PM |
| 98322 | Closed | TS-06 | 3302 | SSY | REPLACE AXLE# 4 (CENTER DISC CRACK FOUND ON LEVEL 1 INSPECTION) | REPLACE AXLE#3 AND #4 | AXLE#4 REMOVED S/N HAS BEEN DAMAGED CAN ONLY SEE LAST 5 DIGITS - J6446R4 4130L14 4130 AXLE# 4 INSTALLED S/N# 078-J5713R4 14924 L4 14817 AXLE # 8 REMOVED S/N# 055-S247R3 4131L3 4133# AXLE#3 INSTALLED S/N# J023-J5713R3 14920L3 14918 | 08/06/04 08:14AM | JVERA | 08/06/2004 09:57AM |
| 85433 | Closed | TS-06 | 3554 | SSY | AXLE #1 BRAKE DISC CRACK WITHIN LIMITS | REPLACE AXLE #1 DUE BRAKE DISC CRACK WITHIN LIMITS | AXLE #1 WHEELSET WAS REPLACED | 11/3/03 03:52PM | JAGBEMATU | 12/01/2003 02:56PM |
| 93720 | Closed | TS-07 | 3556 | SSY | ON LEVEL 1 FOUND 2 1/2 CRACK ON SURFACE OF DISC ON AXLE | TO RE-INSPECTION ON AXLE AND MONITOR ON LEVEL INSPECTION | CRACK TO BE MONITOR FOR MIGRATION | 05/07/04 10:18AM | GIACOMOHAN | 05/07/2004 10:34AM |
| 86318 | Closed | TS-08 | 2014 | ICCS | L3 OUTBOARD CHEEK DISC SURFACE CRACK 19MM LONG | | AT THE EDGE OF A BOLT HOLE INBOARD HAS ONE 10MM LONG AND ONE 10MM LONG OK BY PROCEDURE 4225 REV1 A 20MM LIMIT | 12/16/03 08:47AM | TBERNARDING | 12/16/2003 08:53AM |
| 94481 | Closed | TS-08 | 2014 | ICCS | REPLACE REAR TRUCK L#3 INSIDE CHEEK DISK CONDEMNABLE CRACK | | New axle 1 646-J6446 Axle 2 014-J6446 Truck # CL264-C670 of Truck #CL260-C62 | 05/21/04 08:22PM | MDOYLE | 05/23/2004 11:39PM |

2 of 5

ISL-2420 Cracked Disc list Rev_02.doc

| Work Order | WO Status | Parent Equip. Code | Equipment Code | Facility ID | Work Order Title | Job Description | Work Order Job Note | Required in Date | Last Updated By | Last Update Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 99799 | Closed | TS-03 | 2019 | ICCS | CRACKED CENTER DISC ON REAR TRUCK FAR-18800 | | | 10:05PM | | 10:59PM |
| 100469 | Closed | TS-08 | 3315 | SSY | INNER BRAKE DISC ON AXLE #4 IS CRACKED FAR-15070 | REPLACE AXLE# 4 | AXLE#4 HAS BEEN REPLACED....DUE TO LACK OF HARDWARE AXLE#3 WAS NOT REPLACED | 09/15/04 10:05PM | JVERA | 09/15/2004 09:47AM |
| 98559 | Closed | TS-08 | 3548 | SSY | WHEELSET ASSEMBLY R3 DISC CRACK (04151800625) | REMOVED&REPLACED | REPLACED WITH STOCK UNIT | 08/1/04 07:30AM | GJAGMOHAN | 08/11/2004 02:03PM |
| 101838 | Closed | TS-08 | 3558 | SSY | AXLE #4 WHEELSET HAS A CRACK ON CENTER BRAKE DISC FAR-15700 | REPLACE AXLE #4 WHEELSET DUE TO CRACK ON CENTER DISC | AXLE #4 WHEELSET WAS REPLACED | 10/1/04 08:46PM | JAGBBMATU | 10/10/2004 11:19PM |
| 99962 | Closed | TS-09 | 3544 | ICCS | CENTER MONOBLOCK DISC HAS 2" CRACK, LEFT SIDE | | INSPECTED AND FOUND TO BE WITH IN TOLERANCE OF THE PROCEDURE IN TECHNICAL BULLETIN #66. DISC IS SERVICEABLE. | 09/03/04 12:20PM | PFELES | 09/10/2004 09:57AM |
| 93903 | Closed | TS-09 | 3547 | SSY | AXLE #1 CENTER DISC CRACKED BEYOUD LIMIT (2" LONG, 0.012" WIDE) | REMOVED & REPLACED | REPLACED AXLE #1 WHEEL SET | 05/11/04 08:22AM | JAGBEMATU | 05/11/2004 09:55AM |
| 84012 | Closed | TS-11 | 3316 | SSY | AXLE #4 WHEELSET HAS A CRACKED DISC AT L4 LOCATION | REPLACE WHEELSET | REPLACED WHEELSET | 11/04/03 07:06PM | JAGBEMATU | 11/05/2003 06:27PM |
| 70893 | Closed | TS-12 | 2006 | ICCS | R-2 BRAKE DISC HAS A PATTERN OF CRACKS VERY CLOSE TO THE BOLT HOLE | | | 04/1/03 05:36AM | | |
| 96110 | Closed | TS-13 | 3213 | SSY | L4 BRAKE DISC HAS A CRACK (1.5" LONG AND 0.012" WIDE) | REPLACE AXLE 4 | REPLACED WHEELSET DUE TO A CRACK ON L4 BRAKE DISC | 06/22/04 01:38PM | JAGBEMATU | 06/22/2004 01:58PM |
| 77763 | Closed | TS-13 | 2348 / 3552 | SSY | AXLE #1 PARKING BRAKE DISC HAS CRACK IN TWO PLACES FAR-14568 | AXLE #1 PARKING BRAKE DISC HAS CRACK IN TWO PLACES | Updated on 8/7/03 not relevant. Casting Slug <100mm length | 07/19/03 02:16AM | AMORAN | 08/07/2003 02:02PM |
| 81465 | Closed | TS-13 | 3537 | SSY | AXLE 2 CENTER BRAKE DISC IN CRACKED BEYOND LIMIT | AXLE 2 CENTER BRAKE DISC CRACKED BEYOND LIMIT | Updated 10/20/03 Relevant. | 09/21/03 05:45AM | AMORAN | 10/20/2003 10:51AM |
| 78354 | Closed | TS-13 | 3552 | SSY | AXLE #3 HAS A | REMOVED DEFECTIVE | Axel #3 Routing Discs has | 07/29/03 | SLABBE | 08/14/2003 |

ISL-2420 Cracked Disc list Rev_02.doc

| Work Order | WO Status | Parent Equip. Code | Equipment Code | Facility Id | Work Order Title | Job Description | Work Order Job Note | Resolved In date | Last Updated By | Last Update Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 98619 | Closed | TS-14 | 3317 | ICCS | CRACKED DISC #0415118006Z3 CRACK BRAKE DISC ON AXLE#4 | UNIT, REPLACED WITH STOCK UNIT | crack on L4, Center Disc had a 17-3/4 crack Left Disc had a 18-5/8 Crack Wheel set was removed and replaced | 05:49AM | | 04:51PM |
| 82915 | Closed | TS-15 | 3522 | SSY | REPLACE AXLE #1- DISC HAS 2 CRACKS, 1 ON EDGE AT R1 | REPLACE AXLE #4 WHEELSET | REPLACED AXLE #4 WHEELSET | 08/12/04 07:38AM | JACOBEMATU | 08/12/2004 02:03PM |
| 82828 | Closed | TS-15 | 3524 | SSY | REPLACE AXLES #1 AND #2 WHEELSET ASSEMBLIES-BOTH WHEELSETS HAVE CRACKED DISC | DEFECTIVE REPLACED WHEELSET WITH NEW ONE FROM STOCK | DEFECTIVE REPLACED WHEELSET.S/N OF REMOVED AXLE: 0USN OF INSTALLED AXLE: 079-J5713 | 10/17/03 04:55PM | JACOBEMATU | 10/17/2003 05:32PM |
| | | | | | | REMOVED DEFECTIVE PART, REPLACED WITH STOCK UNIT | REPLACED AXLES #1 & #2 WHEELSETS.AXLE #1: REMOVED PART S/N: 004-J7T21 AXLE #1: INSTALLED PART S/N:J44-7121 AXLE #2: REMOVED PART S/N J687-J6446 AXLE #2: INSTALLED PART S/N:065-J5713 | 10/15/03 08:03PM | JACOBEMATU | 10/17/2003 04:45PM |
| 103407 | Open | TS-15 | 3545 | SSY | Surface cracks on L1 | Surface cracks on L1. | NO RE-INSPECTION ON AMD MONITOR ON LEVEL 1 INSPECTION | | | |
| 96425 | Closed | TS-16 | 3313 | SSY | AXLE #3 CENTER BRAKE DISC HAS A CRACK (OVER 2" LONG & 0.012" WIDE) | REPLACED WITH NEW WHEELSET. | J345-Two surface cracks on L1, 1.750 & 1.400 long, <.012 wide. J345-Chip is .070 deep. | 06/28/04 01:41PM | JACOBEMATU | 06/28/2004 07:45AM |
| 78896 | Closed | TS-17 | 3412 | SSY | BRAKE DISK CRACK AT AXLE #1 FAR-J4669 | BRAKE DISK CRACK AT AXLE #1 | a 2inch crack was found on the disc during inspection wheel set was removed and replaced; Casting Slug <100mm length | 08/07/03 02:59AM | FMONTERO | 08/07/2003 07:45AM |
| 91744 | Closed | TS-17 | 3339 | SSY | BRAKE DISK CRACK IS ON AXLE 4 (@L4) | REPLACE AXLE# 4 | replaced axle#4 | 03/27/04 05:55PM | JVERA | 03/27/2004 07:19PM |
| 102616 | Closed | TS-18 | 3311 | SSY | L1-R1 CENTER DISC HAS SURFACE CRACK WITHIN LIMITS | L1-R1 CENTER DISC HAS SURFACE CRACK WITHIN LIMITS | Work order open under wrong type code, should have been open under incident for re-inspection | 10/23/04 06:34PM | GIACOMOHAN | 10/24/2004 08:55AM |
| 83914 | Closed | TS-19 | 3202 | SSY | CRACK WHEELSET IN FIRST DISC R2 | REMOVED DEFECTIVE PART REPLACED WITH STOCK ITEM#0415118006Z3 | REPLACED WHEELSET S/N 079-J664212 J549082 85404REMOVED WHEELSET S/N 003-J5713L2 85831R2 85430 | 11/02/03 11:37AM | AMEDINA | 11/02/2003 12:38PM |
| 100475 | Closed | TS-19 | 3512 | SSY | AXLE #1 CENTER DISC CRACK, AND AXLE#2 | REPLACE AXLE#1 DUE CRACK AND AXLE#2 | REPLACED #1 AXLE DUE CRACKED DISC BRAKE. | 09/15/04 01:26PM | GIACOMOHAN | 09/15/2004 01:52PM |