RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2006 DEC 11 PM 4:18

NANCY M.
MAYER-WHITTINGTON
CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRED E. WEIDERHOLD, JR.
AS INSPECTOR GENERAL
NATIONAL RAILROAD PASSENGER
CORPORATION,

    Petitioner

v.

KNORR BRAKE CORPORATION,

    Respondent.

Misc. Civil No.
06:423 (PLF)(dar)

## REPLY OF THE NATIONAL RAILROAD PASSENGER CORPORATION INSPECTOR GENERAL TO RESPONSE OF KNORR BRAKE CORPORATION

### Introduction

Fred E. Weiderhold, Jr., Inspector General ("IG") of the National Railroad Passenger Corporation ("Amtrak"), through his undersigned attorneys, respectfully submits its Reply to "Response of Knorr Brake Corporation to the Order to Show Cause Dated October 13, 2006."[1] The IG Subpoena issued to Knorr Brake Corporations ("Knorr") was part of a Congressionally-mandated investigation into a safety critical issue involving cracked brake spokes on the Acela trains. The IG initiated an investigation to determine, inter alia, the sequence of events that resulted in the discovery of the cracked brake spokes. The IG investigation included, but was not limited to, the cause of the cracks,

---

[1] Citations herein to the Response will be abbreviated "Res."; citation to Respondent's Memorandum in support of Knorr Brake Corporation's Response to the Order to Show Cause filed October 13, 2006" will be abbreviated "Res. Mem."

when the cracks first occurred, when the cracks were first noticed and by which company or companies, and what was done, if anything, with the information concerning the cracked brake spokes and by whom.

The IG investigation focused on those companies, including Knorr, that were responsible for the manufacturing and maintenance of the brakes. The IG issued subpoenas that sought documents from these companies, including Knorr, concerning the Acela brakes. Such documents were, obviously, necessary for the IG to conduct and complete its investigation. Several companies readily complied with the IG subpoena request, while others, including Knorr, repeatedly delayed production.

While Knorr's belated attempt to complete production of documents pursuant to the IG Subpoena narrowed the scope of issues for judicial resolution, as set forth below, there remain unresolved several critical issues before this Court.

### Respondent's Refusal to Comply with the Subpoena

1.  Respondent claims that, as of the date of its Response to Amtrak's Subpoena Enforcement Petition, it has completed its production "for all practical purposes." Res. Mem. p.2. It is noteworthy that Knorr only completed this level of production after Amtrak filed its petition with this Court and, only then, after Knorr sought and obtained two enlargements of time to file a response to this Court's Order to Show Cause Dated October 13, 2006. Given Knorr's prior history of delay, failure to abide by both deadlines established by Amtrak as well as those self-imposed, Amtrak asserts that, but for its filing the Subpoena Enforcement action, Knorr would not have achieved this alleged level of

2

production. As noted below, however, Knorr still has not fully complied with the stated terms of the Subpoena.

2. Knorr contends, "neither Amtrak nor any governmental agency appears to consider the long-since resolved Acela Brake Spoke Problem to be an ongoing matter of concern." Res. ¶ 2. This is untrue. Congress directed the IG to investigate this matter. Additionally, the IG has received repeated and recent inquiries into the status of its investigation into the Acela Brake Spoke Problem from Congressional oversight committees.

3. Knorr states that, during a June 2, 2005 meeting, Petitioner prioritized its requests under the Subpoena. Res. ¶ 11. Knorr then lists the priorities in order of importance. *Id.* Specifically, Knorr claims that Petitioner sought as his, "highest priority. . . documents relating to all contracts, subcontracts and/or agreements between [Knorr] and any other entity related to the Amtrak Acela trains. . ." *Id.* Next, according to Knorr, Petitioner wanted "documents Petitioner described as pertaining to [Knorr's] knowledge of matters relating to any potential defects or problems with products for Amtrak Acela trains. . ." *Id.* Finally, Knorr represents that Petitioner set as his third priority "all technical service manuals, bulletins, and advisories for the Acela trains related to the brakes only. . . ." *Id.* Petitioner asserts that Knorr's ranking of Petitioner's priorities is erroneous.

4. Rather, Petitioner sought to prioritize those documents in Knorr's possession that evidenced Knorr's knowledge of matters relating to any defects, potential defects, problems or potential problems with the Acela brakes. It was only based on representations made by Knorr's counsel during the

aforementioned meeting that Petitioner agreed to accept those documents relating to contracts, subcontracts and/or agreements between Knorr and other entities first. Specifically, counsel for Knorr represented to Petitioner's counsel that Knorr had readily available for production to Petitioner those documents relating to contracts, subcontracts and/or agreements between Knorr and other entities. For obvious reasons related to the catalyst for Petitioner's investigation, the IG sought to promptly determine whether Knorr or any other entity had knowledge of brake or spoke deficiencies prior to the Federal Railroad Administration's identification of this as an issue. Petitioner never anticipated that it would take Knorr 18 months to comply with priority number two and requested on numerous occasions that Knorr make more full and prompt production.

5. Furthermore, Instruction 2 of the Subpoena requires Respondent to cross-reference or index each of the documents produced to the numbered Subpoena request to which it is responsive. Respondent failed to provide an index in its production. Petitioner was, therefore, unable to identify which documents corresponded to which of the subpoena subparts. This is critical given the nature of the IG's investigation and the manner in which Knorr produced the purportedly responsive records.

6. In Knorr's correspondence sent with the document production, it simply stated that the documents contained on the DVDs were in response to the Subpoena and then provided the Bates number range for that particular production. Res. Mem., Exhibits 19, 30, 33, 34, 39 and 41-43. Knorr failed to provide any identifying information concerning what type of documents were contained on the DVDs provided. *Id.* Instead, Petitioner has been left to wade

through a morass of documents, many of which were non-responsive to the Subpoena request or the prioritized list provided to Knorr, trying to find the proverbial needle in a haystack. For instance, which documents does Knorr consider responsive to subpoena request for documents number ten (10) which requests, "All documents which describe, discuss or relate to Quality Assurance reports of cracks and statements pertaining to the Acela brakes"? Pet. Mem. Exhibit 5. Therefore, the Court must require Knorr to comply with the Subpoena request that it identify the questions to which the supplied documents respond. See, Wagner v. Dryvit Systems, Inc., 208 F.R.D. 606, 610 (D. Neb. 2001) (Court held that "producing large amounts of documents in no apparent order does not comply with a party's obligation under Rule 34").

7.   On this related matter, Knorr alleges that it should not be required to generate an index for the documents it produced as called for in the Subpoena. Res. ¶ 56 and Res. Mem. pp 11-12. Specifically, Knorr states that, "[s]uch a requirement would force [Knorr] to conduct a page-by-page review of over 630,000 pages it has produced. . . ." Res. ¶ 56. Presumably, Knorr has already conducted a page-by-page review of the documents to determine whether or not the documents were responsive to the IG Subpoena.[2] If Knorr has conducted this level of document review, then it was in the position of creating an index that identified to which subpoena subpart a document responded. Knorr's tactic to ignore this aspect of the subpoena, whether purposefully or not, should not relieve it of its obligation to provide the IG with a reasonable nexus between the documents and the subpoena subparts. If, however, Knorr failed to conduct such

---

[2] Knorr states in its Response that, on or about September 22, 2005, it was scheduled to "begin to review and process the electronic documents for production to Petitioner." Res. ¶ 18.

a document review, then it has deliberately produced tens of thousands of pages of non-responsive documents.

8. Furthermore, Knorr has indicated that it has reviewed the documents for various privileges. Specifically, Knorr cites as a reason for delay in production a time-consuming review process "given the amount of material needed to be reviewed for privilege, . . . ." Res. ¶ 18. As further proof of its review of documents, Knorr states that all that remains of its document production is "to complete its ongoing review of a small subset of potentially privileged documents. . . ." Res. Mem. p. 2. For Knorr to have culled this "small subset" of documents from the 630,000 produced to the IG would necessitate a page-by-page review by Knorr. Petitioner reasserts that Knorr should not be relieved of its obligation to provide an index because it failed to do so when presented the opportunity.

9. Knorr, self-servingly, claims that an index "would not provide any discernible benefit to Petitioner's investigation." Res. ¶ 56. Petitioner disagrees with this contention. The benefit to Petitioner in having an index that provides a nexus between requested documents and the subpoena subparts is obvious in that it would allow Petitioner to focus on the documents relevant to its investigation in a more expeditious manner.

10. Knorr continues that it should not be required to produce an index as set forth in the Subpoena because documents previously produced might be responsive to multiple subpoena requests. Res. Mem. p.12. Pursuant to the Subpoena, Knorr was required to produce documents either in the normal course of business or with an index. Knorr has done neither. Petitioner has never

6

modified this requirement. Knorr, having already reviewed the documents for relevancy and privilege, is in the best position to complete the index. To do so, would neither be unreasonably time-consuming nor unduly burdensome.

11.   Knorr also contends that Petitioner has only recently raised the issue of producing the subpoenaed documents in their "native format." Res. Mem. p. 4. In fact, as early as September 12, 2005, David Sadoff, Esq., Counsel for Petitioner in <u>Weiderhold v. Bombardier, et al.</u>, Civil No. 1:05-MS-0367 (PLF)(dar), and Knorr's counsel, John G. DeGooyer, Esq., discussed that Knorr had a certain number of responsive documents, including electronic documents, in their native format and discussed production. Exhibit 1.

12.   Finally, Knorr claims that Petitioner has made misrepresentations in an effort to justify its Subpoena enforcement action. Res. ¶ 60 and Res. Mem. pp 13-16. This is untrue. Petitioner's investigation is to determine which parties knew, not just about the cracked disc brake rotor spokes that led to the suspension of service for the Acela trains, about any brake deficiencies and when. The example provided in the Petition was intended to represent the type of notice documents that Petitioner previously uncovered in an effort to illustrate the type of documents that could be in Knorr's possession with regard to the cracked disc brake rotor spokes. At the time the IG filed the Petition, Knorr had failed to complete document production. Petitioner sought (and still seeks) enforcement of his subpoena to make certain that, if Knorr possesses documents that reveal knowledge of the cracked disc brake rotor spokes, those documents are provided to Petitioner.

7

Relief Requested

WHEREFORE, Petitioner respectfully reiterates its requests that this Court:

1.     Order that Respondent fully comply, within fifteen (15) days or on such accelerated schedule as the Court deems proper, with the terms and instructions of the Subpoena; and

2.     Grant such other and further relief, as this Court deems necessary and appropriate, including costs.

                Respectfully submitted,

                COLIN C. CARRIERE (# 375016)
                Counsel to the Inspector General
                Office of the Inspector General
                National Railroad Passenger Corporation
                10 G Street, Northeast
                Room 3E-404
                Washington, DC  20002
                Tele: (202) 906-4355

                */s/ James E. Tatum, Jr.*
                JAMES E. TATUM, JR. (# 432860)
                Associate Legal Counsel to the Inspector General
                Office of the Inspector General
                National Railroad Passenger Corporation
                10 G Street, Northeast
                Room 3E-414
                Washington, DC  20002
                Tele: (202) 906-4151

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRED E. WEIDERHOLD, JR.<br>AS INSPECTOR GENERAL<br>NATIONAL RAILROAD PASSENGER<br>CORPORATION,<br><br>　　　　Petitioner<br><br>　　　　v.<br><br>KNORR BRAKE CORPORATION,<br><br>　　　　Respondent. | Misc. Civil No.<br>06:423 (PLF)(dar) |

## **DECLARATION OF DAVID SADOFF**

David Sadoff declares and states as follows based on personal knowledge:

1. From October 2003 to date I have served as Associate Counsel to the Inspector General ("IG") for the National Railroad Passenger Corporation ("Amtrak").

2. In that capacity, during June through mid-September, 2006, I assisted in efforts to secure prompt compliance by Knorr Brake Corporation ("Knorr") with Subpoena No. 05-03 issued by Amtrak's IG to Knorr on May 5, 2005 ("Subpoena").

3. On September 12, 2005, I participated in a telephone conversation with John G. DeGooyer, Esquire, counsel for Knorr, related to his client's compliance with the Subpoena. Also participating on behalf of the IG were Colin C. Carriere, Esquire, Counsel to the IG, and James E. Tatum, counsel for Petitioner in this matter.

4. My contemporaneous notes of the conversation indicate that Mr. DeGooyer described how Knorr had collected electronic files from its "e-mail network" and from

the archived hard drives of various employees on compact discs ("CD-roms"). My notes describe the documents as in "native format" and further describe the number of folders and their combined size. My notes do not indicate and I do not recall whether the phrase "native format" was Mr. DeGooyer's or my own.

5.  My notes further record that Mr. DeGooyer described the e-mails as being in the ".PST" format. It is my understanding that the ".PST" format is the original or "native" format for e-mails in the Microsoft Outlook system. My notes further reflect Mr. DeGooyer further stating that some e-mails had attachments in other formats, including "Excel", "PowerPoint" and video.

6.  It was my understanding at the time of he conversation that the responsive documents would be produced in their "native formats" described by Mr. DeGooyer.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 11, 2006.

_____
David Sadoff

CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of December, 2006, I caused to be served a copy of "Reply of the National Railroad Passenger Corporation Inspector General to Response of Knorr Brake Corporation" and Exhibit on the below-listed counsel, by facsimile, electronic mail and United States mail, first-class postage prepaid:

>John G. DeGooyer, Esq.
>Foley & Lardner, LLP
>Washington Harbour
>3000 K. Street, NW
>Suite 500
>Washington, D.C. 20007-5143
>(202) 672-5300 (telephone)
>(202) 672-5399 (facsimile)
>jdegooyer@foley.com (e-mail)

James E. Tatum, Jr.